**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **CHAVON ADIR WIGGINS,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **vs.** | ) **Case number 4:07cv1288 TCM** |
| | ) |
| **CHRIS KOSTER and** | ) |
| **JOHN T. RATHMAN,**[1] | ) |
| | ) |
| **Respondents.** | ) |

## MEMORANDUM AND ORDER

Chavon Adir Wiggins (Petitioner) petitions the United States District Court for the Eastern District of Missouri for federal habeas corpus relief from a Missouri conviction after a jury trial.[2]  See 28 U.S.C. § 2254.  Finding the federal habeas petition presents sixteen grounds for relief, and concluding that ten grounds are procedurally barred and the other six grounds are without merit, the petition will be denied without further proceedings.

## Background

Petitioner was charged, as a prior and persistent offender, with acting with others to

---

[1] Jeremiah W. "Jay" Nixon, the then-Attorney General for the State of Missouri, and Ricardo Martinez, the Warden of the United States Penitentiary-Lewisburg, were named as Respondents in this habeas action.  See Case Management Order (Doc. 18).  Because Chris Koster is now the Attorney General for the State of Missouri the Court will substitute him for Jeremiah W. "Jay" Nixon as a Respondent in this case.  Additionally, because Petitioner has advised the Court that he is now at the Federal Correctional Institution in Talladega, Alabama (see Pet'r Letter (Doc. 29)), where John T. Rathman is the Warden, the Court will substitute John T. Rathman for Ricardo Martinez as the second Respondent in this case.

[2] This matter is before the Court for resolution of the claims in the Amended Petition Petitioner filed on October 1, 2007 (Doc. 9).  See Case Management Order (Doc. 18).  The Court will refer to the Amended Petition as the petition.

commit one count of murder in the first degree, in violation of Mo. Rev. Stat. § 565.020, for the shooting death of Harlan Tyler on July 6, 1998; two counts of first degree assault, in violation of Mo. Rev. Stat. § 565.050, for shooting and inflicting serious physical harm on Latoya Jones and Steven Smith, who were shot on July 6, 1998; one count of burglary in the first degree, in violation of Mo. Rev. Stat. § 569.160, for unlawfully entering Tyler's apartment on July 6, 1998; one count of stealing a motor vehicle, in violation of Mo. Rev. Stat. § 570.030, for taking a van from Audrey Dolan without her consent on or about July 5, 1998; one count of robbery in the first degree, in violation of Mo. Rev. Stat. § 569.020, for forcibly stealing property from Tyler on July 6, 1998, while armed with a deadly weapon; and four counts of armed criminal action, in violation of Mo. Rev. Stat. § 571.015, related to the murder, assault, and robbery offenses.  (Information, filed Oct. 16, 2002, Legal File, Resp'ts Ex. 6, at 6-20 [all of Respondents' exhibits are part of Doc. 27]; Trial Court Findings that Pet'r was a Prior and  Persistent Offender, Legal File, Resp'ts Ex. 6, at 52 and Trial Tr. Vol. 1, Resp'ts Ex. 1, at 36-37; Trial Tr. Vol. 5, Resp'ts Ex. 5, at 1471.)

Less than a week prior to the start of trial, Petitioner's defense attorney (Counsel) sought leave to withdraw on the ground that Petitioner had, on one occasion during that week, struck Counsel in the face at the conclusion of a contact visit at the jail, and Counsel was pursuing criminal charges against Petitioner as a result of that altercation.  (Mot. Withdraw, Legal File, Respt's Ex. 6,  at 28-29; 39-42.)  In his motion, Counsel reported that he thought he had a conflict of interest in representing Petitioner due to the pending criminal charges, he

"fe[lt] he cannot zealously represent [Petitioner]" in the criminal case, and he found Petitioner

"repugnant." (Id.) At a pre-trial hearing on the motion to withdraw, the trial court heard

argument of Counsel, of an attorney who entered an appearance only to represent Petitioner

on the motion to withdraw and related hearing (Withdrawal Counsel), an attorney who

represented the interests of trial counsel and the state public defender system (Supervisor),

and the prosecutor. (See Entry of Appearance, Mot. for Appointment of Substitute, Conflict-

Free Trial Counsel, and Motion for Continuance of Trial Setting, Legal File, Resp'ts Ex. 6,

at 30-49 and Trial Tr. Vol. 1, Resp'ts Ex. 1, at 3-32.) While acknowledging there was a

conflict between Counsel and Petitioner, the trial court denied the motion stating that

Petitioner "cannot be permitted to benefit from his misconduct" and that the trial court did

"not want to send the message that the way to get a continuance or the way to get a new

lawyer is to attack your attorney." (Trial Tr. Vol. 1, Resp'ts Ex. 1, at 30-31.) The trial court

ordered Counsel to provide Petitioner with effective assistance of counsel, required Petitioner

to be shackled ("his hands will be belly-chained, his feet will be tethered") throughout trial,

and directed that Petitioner be given a pad of paper and pen for the purpose of writing notes

to Counsel. (Id. at 31-32; see also id. at 62-63, 65-66, 312-13.) The trial court further

provided that jurors not be allowed in the courtroom until Petitioner was seated. (See, e.g.,

id. at 313.) Throughout trial Supervisor sat between Petitioner and Counsel. (Id. at 32.)

Prior to trial, the trial court granted and denied various motions in limine. (See, e.g.,

id. at 37-60; Pet'r Mot. Limine, Legal File, Resp'ts Ex. 6, at 50-51; Trial Tr. Vol. 1, Resp'ts

Ex. 1, at 37-60.)  One such motion filed by Petitioner sought to preclude the State from "elicit[ing] testimony that [Petitioner] possessed firearms in the past or showed firearms to persons on dates before . . . the crimes for which [Petitioner] is charged [because such] testimony is proof of prior bad acts and/or uncharged crimes and is more prejudicial than probative."  (Pet'r Mot. Limine, Legal File, Resp'ts Ex. 6, at 50-51; Trial Tr. Vol. I, Resp'ts Ex. 1, at 58-60.)  After hearing argument, the trial court denied the motion upon noting the State was going to be "referring to two guns" that were expected to be in evidence as part of the crimes charged and it would be up to the jury to decide whether the guns reportedly seen with Petitioner before the crimes were the same guns that were involved in the crimes charged.  (Trial Tr. Vol. I, Resp'ts Ex. 1, at 60.)

During the six-day trial, the State introduced the testimony of twenty witnesses. Audrey J. Dolan testified that she lived about a block east of Tyler's apartment and sometime between 10:40 p.m. on July 5, 1998, and 7:30 a.m. on July 6, 1998, her van was stolen.  (Trial Tr. Vol. III, Resp'ts Ex. 3, at 630-36.)  LaToya Jones testified that she was with Tyler the night he was shot, they had been sleeping in the bedroom and were awakened when the door was kicked in by four men, and she was shot, sustaining injuries to her left hand, stomach, chin, and face, including the loss of seven teeth and her left eye.  (Trial Tr. Vol. V, Resp'ts Ex. 5, at 1245-50.)  Jones also identified as belonging to Tyler the clothing Officer Kevin Cissell seized from a residence on Minnesota Avenue and referred to as Petitioner's and Ronnie's cousin's home.  (Id. at 1252-57.)

Officer William Miller with the City of Olivette Police Department testified that he was first to arrive on the scene in response to a report of shots fired at an apartment complex on July 6, 1998, and he found a white male bleeding from his neck on a landing outside an apartment building, with a woman "over the top of him" and a dog on a leash running loose nearby, and a bullet fragment in the wall; the woman was the man's girlfriend and told Officer Miller that the man's name was Steven Smith. (Id. at 1167-72, 1176.) Officer Miller stated the man reported that a black male had shot him and had run upstairs; Officer Miller went up, found Tyler's apartment door was open, noticed the belongings in the apartment were in disarray, discovered Tyler's body, which was "tied, bound, gagged, [had] numerous stab wounds[, and] appeared to have also been shot," in the bedroom, and found a woman, who had been shot several times, in the bathroom. (Id. at 1176-82.) Ronald Turgeon, the medical examiner, testified Tyler only had shorts on and his ankles were bound together, his wrists were bound together behind his back, duct tape was wrapped around his head covering his eyes, and his body revealed, among other things, the existence of several stab wounds, several slash wounds, and two gunshot wounds. (Trial Tr. Vol. III, Resp'ts Ex. 3, at 831, 834-35, 843-44, 846-47, 848, 850-51, 852, 853, 854, 856-57, 864, 870.) He opined that Tyler died of a gunshot to the head. (Id. at 870.)

Olivia Barton testified she and Brandi Benton met Petitioner, Ronnie,[3] and two men she did not know, late on the evening of July 5, 1998, when they drove first to a place where

---

[3] Ronnie is Petitioner's cousin, Robert Wiggins. For convenience, the Court will refer to this person as Ronnie. By using this name, the Court means no disrespect to him.

Petitioner changed clothes, and on the way there Petitioner said "I'm gonna get this nigger. This is the big one. We're gonna come out big on this." (Trial Tr. Vol. III, Resp'ts Ex. 3, at 637, 640-41, 643-45.) Then, they went to Ronnie's mother's house where Petitioner and the two men were dropped off and then the women and Ronnie went to Benton's home, where Barton stayed to babysit Ronnie's daughter, and Benton and Ronnie left. (Id. at 646-48.) She noticed that Petitioner, Ronnie, and one of the other men had dark-colored hats with them that evening. (Trial Tr. Vol. V, Resp'ts Ex. 5, at 1238-39, 1243, 1244.) Barton further testified that on or about July 9, 1998, she gave an oral, then a written, and then a videotaped statement (in which she read her written statement) to the police; and identified the four men involved through a photo lineup. (Trial Tr. Vol. III, Resp'ts Ex. 3, at 650-61; Trial Tr. Vol. V, Resp'ts Ex. 5, at 1238-39.)

Brandi Benton, who had been Ronnie's girlfriend and was raising his daughter, testified that late the evening of July 5, 1998, Ronnie asked her if she wanted to make some money and if her friend, Barton, would like to make money babysitting. (Trial Tr. Vol III, Resp'ts Ex. 3, at 688.) She said yes and when she was with Ronnie, with Barton and Ronnie's daughter, she drove Petitioner and two males she did not know first to a house where Petitioner changed, then to Ronnie's mother's home, and then she took Ronnie, Barton, and Ronnie's daughter to her home. (Id. at 688-89, 695-97.) After leaving Barton and Ronnie's daughter at her home, Benton drove with Ronnie back to Ronnie's mother's home where Petitioner and the two other men got in the car. (Id. at 698.) The men gave Benton directions on where to go and they

ended up parked at an apartment complex, where the men got out of the car.  (Id. at 699, 701.)

She noticed that Petitioner and Ronnie had white gloves in their hands when they got out of

the car.  (Id. at 726.)  She watched the men approach an apartment building, heard a loud

sound, and saw two of the men get on a balcony and, after some time, off the balcony before

all the men returned to the car.  (Id. at 702-03.)  They spent some time driving around, during

which she heard Petitioner say, "I'm gonna get this nigga.  I'm gonna come out big this time.

And another unknown black male in the car said, 'I got your back on this one.'"  (Id. at 705-

06.)  Benton also heard Petitioner make statements that he "ha[d] duct tape, about taping their

mouths shut, tying them up, and ripping phone cords out of the wall" (id. at 707), and that he

was "going to take this nigga's jewelry and his money" (id. at 727).  Benton then drove Ronnie

and another of the men to another apartment complex, dropped Ronnie off, then returned to

the first  apartment complex, where Ronnie met them in a van and told Benton to go home.

(Id. at 708.)  When Ronnie opened the door to get out of the van, Benton saw a crowbar fall

out.  (Id. at 711.)  Benton returned to her home and had breakfast with Barton before going

to sleep.  (Id. at 709, 712.)

Benton further testified that Ronnie called her late that morning and told her she was

not going to see him for awhile because "a barbecue pit blew up in his face."  (Id. at 712.)

Petitioner also called Benton that day and said he was going to get his hair cut "real low" and

get some "slugs [meaning gold teeth] in his mouth."  (Id. at 714, 716.)  Additionally, Benton

testified that a girl called Benton saying she saw something on the news about a hat and asking

whether Ronnie still had the black hat with green stitching of three letters on the back, which, she said, had been found and "had something to do with the murder." (Id. at 713.) Benton then identified a hat, with the letters "LGT," as Ronnie's hat, and identified Petitioner in a picture showing his two gold teeth. (Id. at 714, 715.)

On July 8, 1998, Benton testified, she gave the police an oral statement that she and Ronnie were on the Riverfront the night of July 6th. (Id. at 728-29.) She then gave a written statement that she and Ronnie were driving around that night until he had her drop him off at the apartment complex. (Id. at 730.) The next day she returned to the police department and provided first a written statement of the actual events she was involved in on July 6th, then a videotaped statement, and then a videotaped re-enactment at the apartment complex and at the complex from which the van was stolen. (Id. at 732-35, 743-44.) The videotaped re-enactment was played for the jury, while Benton described what was being shown. (Id. at 735-36.)

Alex Robertson, who made a videotaped confession of his role in the crimes that was played for the jury, testified that he had "a knife, some rope, and some tape" on July 6, 1998, that they went into the apartment after Benton left, that he "cut" Tyler, and they drove away from the scene in a van. (Trial Tr. Vol. IV, Resp't's Ex. 4, at 1049, 1051, 1052, 1059, 1066-67.) Stephen Geyer, an officer with the City of Kirkwood Police Department, testified that just prior to Robertson's testimony, Geyer had interviewed Robertson who told him that Robertson took a woman, who was with Tyler in the bedroom, into the bathroom leaving

Petitioner and Tyler alone in the bedroom, and then he heard shots in the bedroom; and that Petitioner then told Robertson to leave the bathroom, where the woman still was, and then he heard shots fired in the bathroom (id. at 1114-16).

Ronnie testified to his participation in the crimes. (Trial Tr. Vol. 2, Resp's Ex. 2, at 366-549.) He stated that late on July 5, 1998, he went to his cousin's, Terry Wiggins', residence on Minnesota to look for Petitioner who was staying there. (Id. at 367, 377-79.) He found Petitioner walking with someone and met them. (Id. at 370-72.) Benton drove Barton and Ronnie's daughter to meet Ronnie and the others. (Id. at 374-75.) Petitioner knew someone to rob and the four men talked about trying to rob him to get money and drugs. (Id. at 376, 383-84.) Ronnie met the others at his mother's house, after the others went to the house on Minnesota first. (Id. at 376-77, 380.) Ronnie, Benton, Barton, and Ronnie's daughter dropped Barton and Ronnie's daughter off at Benton's home, then picked up Petitioner and the other two men. (Id. at 381-83.) When they got to the apartment complex, all four men got out of the car, while Benton stayed in the car, and Ronnie and another of the men tried to break in on the balcony of the apartment. (Id. at 385-88.) The men went back to Benton's car and they drove around for awhile before returning to the apartment complex. (Id. at 388-89.) Ronnie stole a van and told Benton to leave. (Id. at 390-92.) The four men then got in the apartment through the balcony with a tire iron from the van. (Id. at 392-93, 446-47.) At Petitioner's request, Ronnie helped Alex Robertson, one of the other men there, tie Tyler up; Ronnie used rope that Robertson had brought to tie Tyler's hands behind his back

and to tie his feet, and Robertson used duct tape. (Id. at 397, 436, 439, 444.) Ronnie saw Robertson jab at Tyler with a knife. (Id. at 398.) Robertson took a female in the apartment, Jones, into the bathroom. (Id. at 399.) Ronnie saw Petitioner go to the bedroom and shoot twice at Tyler with a 9 millimeter gun. (Id. at 400-02, 441-42.) After shooting Tyler, Ronnie testified, Petitioner walked toward the bathroom with the 9 millimeter gun and shortly thereafter Ronnie heard two gun shots. (Id. at 403-05, 442, 464-65.) As they left the apartment, Ronnie testified, Petitioner had the 9 millimeter gun and another small gun, and they saw a white man walking a dog; Petitioner pointed the 9 millimeter gun at the man but it did not shoot and Petitioner pointed the other gun, "[t]he Derringer," and shot him. (Id. at 407-09, 468-69.) During the crimes, Ronnie was wearing white gloves that he had brought from his mother's house, and a cap with the initials "LGT" on it. (Id. at 419-20, 424-26.) Ronnie stated they took some clothes and found money, which the four of them split; then Ronnie set the van on fire and went to the hospital for injuries when the van "blew up in [his] face." (Id. at 421-24, 426-27.) Tyler's apartment was not messed up when they arrived but was messed up when they left. (Id. at 448.) On about July 9, 1998, Ronnie turned himself in to the police and gave a written statement and then a videotaped statement of his and Petitioner's involvement in the crimes. (Id. at 452-56, 459-60.) Ronnie re-enacted the crimes and the burning of the van and the videotape of those re-enactments was played for the jury, with the sound off while Ronnie explained what was being shown. (Id. at 470-83.) Ronnie also viewed a photo lineup and picked out Robertson. (Id. at 483-85.)

Donald Coleman, a dentist, testified that someone came to his office the morning of July 6, 1998, and paid cash to have an open face gold crown put on his upper right front tooth and an all gold crown put on his upper left front tooth; and identified Petitioner as the person in the picture the dentist's office took of those teeth after the procedure that day. (Trial Tr. Vol. II, Resp'ts Ex. 2, at 550-66.)

Jaysin Stokes, a neighbor of Petitioner and the brother of a woman who had a child with Tyler, testified that he had introduced Petitioner and Tyler, he and Petitioner had gone to Tyler's apartment once, he saw Petitioner later the day of the crimes with a haircut and gold front teeth, and he saw Petitioner about a month before the crimes with two guns, a "Dillinger" handgun and a 9 millimeter handgun. (Id. at 566-91; Trial Tr., Vol. III, Resp'ts Ex. 3, at 594-630.)

Tiffany Stokes, Jaysin Stokes's sister, testified that she had a long-term relationship with Tyler, who was the father of her child, and that she had met Petitioner through her brother. (Trial Tr. Vol. IV, Resp'ts Ex. 4, at 1131-32, 1133.) She testified that, shortly after Tyler's murder, Petitioner approached her after she got out of a detective's car and asked her how his name had gotten in the investigation of Tyler's murder, then tapped her as she left; she noticed he had a "low haircut" and two gold teeth which he had not had the last time she saw him about three weeks before Tyler's murder. (Trial Tr. Vol. IV, Resp'ts Ex. 4, at 1130-43.)

Various law enforcement officers testified. Thomas Kletzker, a Lieutenant with the City of Olivette Police Department, testified that he went to the crime scene shortly after the

crimes were reported, interviewed Ronnie, and conducted further investigation. (Trial Tr. Vol III, Resp'ts Ex. 3, at 787-824). Detectives Vaughn Creach and Ted Kaminski, police officers in the Crime Scene Unit of the St. Louis County Police Department, testified that they photographed and collected evidence, including a hat, at the crime scene. (Id. at 887-902 and Trial Tr. Vol. IV, Resp'ts Ex. 4, at 903-1022, 1124-30.) Detective Christopher Baranski, a police officer in the Crime Scene Unit of the St. Louis County Police Department, testified that he photographed and seized evidence from Tyler's autopsy. (Trial Tr. Vol. IV, Resp'ts Ex. 4, at 1023-37.) Officer Geyer testified that he had seen Petitioner in April 1998 and at that time Petitioner had hair in corn rows and no gold teeth. (Id. at 1117-19.) Detective Benjamin Michael McBride, a Detective Sergeant with the City of Olivette Police Department, testified that he conducted the videotaped interview of Robertson in late July 1998, which resulted in the identification of the fourth male involved in the crimes, Frank Bell. (Id. at 1144, 1146.) Officer James Stafford, a police officer with the Crime Scene Unit of the St. Louis County Police Department, testified that he seized clothing, including a pair of gloves, from a dumpster near Ronnie's mother's home. (Id. at 1152-59.) Officer John Kaltenbronn, an officer with the St. Louis County Police Department who specializes in firearms and toolmark examination, testified that "four bullets were definitely fired from the same" 9 millimeter semi-automatic handgun and "five spent [9 millimeter] shells were definitely fired from the same firearm," but another bullet, a .38 caliber bullet found in the wall at the landing, was "definitely fired by a different firearm," such as a Derringer. (Id. at 1203, 1204, 1210, 1214,

1220, 1223.)  Officer Kevin Cissell, a member of the City of Kirkwood Police Department, testified that he had investigated the July 6, 1998, shootings, that he had interviewed Barton, and that he had seized a bag containing clothing and a dental receipt from a bedroom during a consent search of Petitioner's and Ronnie's cousin's, Terry's, house.  (Id. at 1223, 1225, 1227, 1228, 1230-31, 1233.)

Petitioner did not take the stand and rested without presenting evidence.  (Trial Tr., Vol. 5, Resp'ts Ex. 5, at 1308-12.)

The jury found Petitioner guilty of all ten counts.  (Verdict Forms, Legal File, Resp'ts Ex. 6, at 97-106; Trial Tr., Vol. 5, Resp'ts Ex. 5, at 1452-57.)  After denying Petitioner's motion for judgment of acquittal or in the alternative, motion for new trial (post-trial motion), the trial court sentenced Petitioner, as a prior and persistent offender, to consecutive terms of imprisonment of life without probation or parole for first degree murder, thirty years for first degree burglary, fifteen years for stealing a motor vehicle, and life for each of the four armed criminal action offenses, the two first degree assaults, and the first degree robbery.  (Post-Trial Mot., Legal File, Resp'ts Ex. 6, at 108-20; Sentence and J., Legal File, Resp'ts Ex. 6, at 121-29; Trial Tr., Vol. V, Resp'ts Ex. 5, at 1459, 1470-73.)  The trial court further directed that the consecutive "sentences be served consecutive to the sentences Petitioner was [then] serving in the federal penitentiary."  (Sentence and J., Legal File, Resp'ts Ex. 6, at 129; Trial Tr., Vol. V, Resp'ts Ex. 5, at 1473.)

Petitioner raised three points on direct appeal.  (Pet'r Br. Appeal, Resp'ts Ex. 8.)  First,

Petitioner argued the trial court abused its discretion and violated Petitioner's rights to due process and the effective assistance of counsel as guaranteed by the Sixth and Fourteeenth Amendments in overruling Counsel's motion to withdraw in that an irreconcilable conflict between Petitioner and Counsel existed due to "fisticuffs [they engaged in] at the jail" prior to trial. (Id. at 12 and 15.) For his second point, Petitioner urged the trial court abused its discretion and violated Petitioner's rights to due process, confrontation, and a fair trial as guaranteed by the Sixth and Fourteenth Amendments in overruling Counsel's objection to and admitting the testimony of Officer Miller that a woman, who did not testify, told him "the white male shooting victim outside the apartment was Steven Smith" and that testimony led to the admission of Smith's medical records, which were irrelevant because he did not testify. (Id. at 13 and 21.) For his third point, Petitioner contended the trial court abused its discretion and violated Petitioner's rights to due process and a fair trial as guaranteed by the Sixth and Fourteenth Amendments in overruling Counsel's motion in limine and objections to Jaysin Stokes's testimony that he saw Petitioner with a 9mm handgun and a "Dillinger" handgun about a month before these crimes. (Id. at 14 and 26.)

The Missouri Court of Appeals for the Eastern District of Missouri, reviewing the first and third points under an abuse of error standard of review, and reviewing the second point under a plain error standard of review, found no error and affirmed Petitioner's conviction in a summary per curiam order, dated August 17, 2004, explaining its decision in a memorandum sent only to the parties. (Mem. Supplementing Order Affirming J. Pursuant to Mo. S. Ct. Rule

30.25(b), Resp'ts Ex. 11.)

As to Petitioner's first point that the trial court erred in overruling Counsel's motion to withdraw, the state appellate court stated:

In deciding whether counsel's motion to withdraw should be granted, the trial court attempts to protect the administration of justice and must be mindful of a defendant's constitutional rights at all stages of the prosecution. State v. Bibb, 922 S.W.2d 798, 803 (Mo. [Ct.] App. 1996). When it is alleged by a defendant that his attorney should be dismissed, or by an attorney that he should be granted leave to withdraw, the court must determine whether an irreconcilable conflict exists between the attorney and his client. [State v. ] Hornbuckle, 769 S.W.2d [89,] 96 [(Mo. 1989) (en banc)]. An irreconcilable conflict exists between them where the evidence shows there is a total breakdown of communication between them. Id. To demonstrate irreconcilable conflict, there must be objective evidence of a total breakdown in communication. [State v. ]Owsley, 959 S.W.2d[ 789,] 792 [(Mo. 1997) (en banc)]. An allegation of total breakdown in communication "may not be grounded on subjective, unsubstantiated feelings, but must be rational. Hornbuckle, 769 S.W.2d at 96 (citing State v. S[]hubert, 747 S.W.2d 165, 170 (Mo. [Ct.] App. 1988)). In making decisions as to dismissing counsel or granting counsel leave to withdraw, the trial court's decisions are "tempered . . . by the public's need for effective administration of justice, [and] will not be lightly disturbed on appeal, particularly when it appears the accused was not denied skillful and competent representation." Id.

. . . [Counsel] filed a motion to withdraw as [Petitioner]'s counsel three days prior to [Petitioner]'s trial. Counsel stated that [Petitioner] assaulted him by punching him in the face at the conclusion of a meeting at the jail four days prior to trial. Counsel argued that he should be granted leave to withdraw because he had a conflict of interest representing [Petitioner] and he was pursuing assault charges against him in municipal court. He also stated that he felt he could not zealously represent [Petitioner] and that he found him repugnant. A hearing was held on Counsel's motion to withdraw before [Petitioner]'s trial began. Counsel stated during the hearing that he hated [Petitioner] and that he felt victimized by him. He reiterated his reasons for wishing to withdraw. Counsel's position was supported by [another attorney] ("Supervisor"), [who was the] Deputy Trial Division Director for the Missouri Public Defender System, who argued that it was appropriate for Counsel to be

allowed to withdraw.

The State argued that Counsel should not be permitted to withdraw because [Petitioner] had attacked Counsel as "a ploy . . . to get a continuance." The State cited State v. Owsley for the proposition that because [Petitioner] created the conflict by attacking Counsel, Counsel should not be permitted to withdraw. 959 S.W.2d 789. Citing Owsley, the State argued that because [Petitioner] created the problem, the trial court needed only to appoint [Petitioner] co-counsel through whom he could communicate with Counsel. The State argued that this was a case of Counsel being dissatisfied with his client, not the client being dissatisfied with his counsel. The prosecutor stated that he was unaware of any charges stemming from [Petitioner]'s hitting Counsel, and the case would be a municipal case over which he had no control. The prosecutor urged the court to consider the State's interests in trying the case. He pointed out that the State had 25 witnesses prepared for trial, many of whom were [Petitioner]'s friends and family, and the case had been docketed for months. The State advocated that Counsel should be ordered to effectively represent [Petitioner], and that any ineffective assistance of counsel claims could be dealt with only after trial.

The trial court denied Counsel's motion to withdraw. The court stated that the evidence reflected a conflict between [Petitioner] and Counsel, but the conflict was created by [Petitioner] and not by Counsel. The court noted that the conflict resulted from [Petitioner]'s misconduct, and it stated that [Petitioner] should not benefit from that misconduct. The court stated it "[did] not want to send the message that the way to get a continuance or the way to get a new lawyer is to attack your attorney." The court ordered Counsel to continue to represent [Petitioner] in compliance with the Code of Professional Conduct and to provide him effective assistance of counsel. The court stated that it had seen numerous attorneys who hated their clients who were still able to provide effective assistance at trial. The court indicated that [Petitioner] was to be tethered during trial, but would be provided with a pen and notepaper through which he could communicate with Counsel. The court also noted that Counsel was to have co-counsel in this case. Supervisor indicated that she would be acting as Counsel's co-counsel, and that she had come into the case after the incident between Counsel and [Petitioner]. Supervisor stated she would sit between [Petitioner] and Counsel, though she indicated that she had no substantive knowledge of [Petitioner]'s case. The court stated it did not believe that Counsel was incapable of hand[l]ing the substantive and procedural aspects of the case, and it noted that the issue raised in Counsel's motion to withdraw

was the inability of Counsel and [Petitioner] to communicate to facilitate effective assistance of counsel. The court ordered Supervisor to facilitate communication between Counsel and [Petitioner].

We agree with the State that Owsley is instructive in this case. In Owsley, a defendant moved to dismiss his counsel and substitute new counsel, alleging that there was an irreconcilable conflict between him and his counsel. 959 S.W.2d at 792. The defendant asserted that he established that there was a total breakdown in communication such that the trial court's denial of his motions was in error. Id. The trial court found that the conflict between the defendant and his attorney resulted from the defendant's uncooperativeness. Id. at 793. It determined that none of the defendant's allegations in support of his motion to dismiss his counsel warranted dismissal, and the Supreme Court of Missouri agreed. Id. at 792-93. The defendant was found to have failed to show an irreconcilable conflict warranting dismissal of counsel because he and his counsel were still communicating. Id. at 793. The court noted that, because the conflict resulted from the defendant's uncooperativeness, he should not be "permitted to generate an 'irreconcilable conflict' through his own misconduct." Id. (citing Hornbuckle, 769 S.W.2d at 97). The Court noted that, even though the defendant had caused the problem, the trial court had taken "the exemplary step" of alleviating stress between the defendant and his counsel by appointing co-counsel to assist in his defense. Id. In denying the defendant's assertion that his counsel should have been dismissed, the court stated: "Having provided [the defendant] co-counsel with whom [he] could presumably communicate, the court did all and more than was required."

The record in this case similarly reflects that the trial court did what it was required to do pursuant to Owsley to ensure that there was not a total breakdown of communication between [Petitioner] and Counsel necessitating Counsel's withdrawal. The trial court held a hearing to consider whether there was a total breakdown in communication between [Petitioner] and Counsel. The hearing revealed that [Petitioner] and Counsel had communicated regarding the trial and [Petitioner]'s defense, and the conflict between them was generated by [Petitioner]'s misconduct at the conclusion of their pretrial meeting. The court found that because [Petitioner]'s misconduct caused the conflict, he should not be allowed to assert that self-caused conflict to gain a continuance. The trial court ordered Counsel to render effective assistance to [Petitioner], and established that [Petitioner] could communicate with Counsel by jotting notes and by communicating through Supervisor.

The record reflects that Counsel participated fully in [Petitioner]'s defense, including making appropriate pretrial and trial motions, selecting jurors, making objections, and conducting cross-examination. Additionally, on the second day of trial, the trial court interviewed [Petitioner] and Counsel outside the presence of the jury to determine if they were successfully communicating during the trial. The following exchange took place:

> [Counsel]: I've conferred with him through [Supervisor]. I have talked to him directly a little bit. Not as much as I probably normally would, to be honest with you, Judge. But she talks to him mostly. But I'll sit in on the conversation and add things.

> [Court]: I just want to make sure that throughout the trial of this case you've had a chance to communicate with the [Petitioner], whether it's directly or indirectly, and whether the [Petitioner has] had the opportunity to communicate with you about issues that he may have some concerns about.

> [Counsel]: Yes. And he has done that a few times. He's written notes.

>          *    *    *

> [Court]: Okay. I'm going to ask [Petitioner]. Because I think it's important that there be communication between the two of you.

>          *    *    *

> [Court]: . . . . I'm just going to ask him whether he has had the opportunity to communicate with you his areas of concern, and that you are able to communicate back to him about these areas. We're coming into this case with a little bit of a cloud. I want to make sure that that's not compounded by a breakdown in communication throughout the trial.

The court then inquired of [Petitioner], who expressed dissatisfaction that his notes were not given to Counsel in time to be relevant during trial. The court indicated that Counsel should be sure to check that [Petitioner] did not

have notes for him before concluding his questioning of witnesses. The court stated: "So let's generally establish [this] procedure to make sure there's some communication between [Petitioner, Counsel, and Supervisor]."

The record reflects that [Petitioner] and Counsel were able to communicate before and during trial, and there is no indication of a "total breakdown in communication" between them. The record reflects that the trial court took care to ensure that [Petitioner] and Counsel communicated throughout trial. In addition to having some limited direct communication, [Petitioner] and Counsel communicated through notes and through Supervisor. Because there was not a total breakdown in communication between them, [Petitioner] has failed to show there was an irreconcilable conflict between them that would require Counsel's withdrawal. Further, [Petitioner] cannot have created the alleged irreconcilable conflict through his own misconduct. State v. Williams, 9 S.W.3d 3, 10 (Mo. [Ct.] App. 1999). The trial court did not abuse it discretion in denying Counsel's motion to withdraw. [Petitioner]'s first point is denied.

(Mem. Supplementing Order Affirming J. Pursuant to Mo. S. Ct. Rule 30.25(b), Resp'ts Ex. 11, at 3-8 (footnotes omitted) (ninth, thirtieth, thirty-eighth, thirty-ninth, fiftieth, fifty-first, fifty-second, fifty-fifth, fifty-sixth, fifty-eighth, sixty-first, and sixty-second alterations in the original.)

In denying Petitioner's second point on direct appeal, that the trial court erred in admitting Officer Miller's identification of Smith, the Missouri Court of Appeals stated:

The record reflects that the State did not wish to call [Smith] to testify, but wanted to bring his medical records into the trial to show that he suffered severe physical injury such that [Petitioner] could be found guilty of . . . first-degree assault, which required the State to prove that serious physical injury resulted. The State sought to admit [Smith]'s medical records to demonstrate he was seriously injured, but [Petitioner's] Counsel objected in so far as the jury had no knowledge of [Smith]'s identity at the initial time the State sought to admit the records. The trial court ruled that the State could not admit the medical records until it laid a "foundation to reflect that [Smith] was, in fact, injured."

Later, the State offered the testimony of Officer William Miller ("Officer") regarding how he acquired [Smith]'s name on the night of the shooting. Officer testified that he was the first officer to arrive on the scene of the crime and he saw a white male lying on the ground, actively bleeding from a gunshot to his neck. The following exchange took place at trial:

[Prosecutor]: . . . . [D]id you ask the person who was shot what his name was?

[Counsel]: I object, your Honor, calls for hearsay.

[Court]: Overruled.

[Prosecutor]: Did the person [who] was shot tell you his name, his own name?

[Officer]: No, sir.

[Prosecutor]: . . . . How did you determine . . . the name [of] the person [who] was shot?

[Counsel]: I object, your Honor, it calls for hearsay.

[Court]: Overruled.

[Prosecutor]: The person [who] was shot . . . [d]id you ask him his name, or did someone tell you his name?

[Officer]: Yes, sir.

[Counsel]: Overruled (sic). It calls for hearsay.

[Prosecutor]: How did you find out his name?

[Officer]: . . . I spoke with the white female . . . .

\* \* \*

[Prosecutor]: The female? Did she tell you his name?

[Officer]: Yes.

[Counsel]: Object, your Honor, leading.

[Court]: Overruled.

[Prosecutor]: Did she tell you his name?

[Officer]: Yes, she did.

[Prosecutor]: What did she tell you his name was?

[Officer]: Steven Smith.

[Prosecutor]: Thank you. Your Honor, I offer into evidence the medical records for the treatment of Steven Smith.

Counsel then requested to approach the bench to discuss the admission of the medical records. The following was said:

[Counsel]: I want to object to the admission of [them] on the grounds that we set out there. But it is double hearsay. The fact that he said he spoke to a woman . . . that's double hearsay, and not an exception to . . . hearsay, to admit how he found out who Steven Smith was. And I'm going to object to these as hearsay . . . . [T]hey are going to fulfill at least one of the elements of the charge, that has to do with Steven Smith, your Honor . . . .

[Court]: The objection is overruled. [The medical records] will be admitted.

We agree with the State that the record reflects that Counsel did not timely object to the admission of this testimony regarding [Smith]'s identity. Although Counsel had made hearsay objections to the prosecutor's questions regarding how Officer learned [Smith]'s name, he made no objection to the specific hearsay question "What did she tell you his name was?," to which Officer replied "Steven Smith."

. . . Because Counsel did not timely object, the admission of Officer's

statement that the [first discovered] victim's name was Steven Smith can be reviewed only for plain error. Rule 30.20.

*   *   *

The admission of hearsay evidence is not plain error if no objection is made at trial to its admission. [State v. ]Henderson, 954 S.W.2d [581,] 584 [(Mo. Ct. App. 1997)] (internal citations omitted). The general rule is that the jury can consider even inadmissible hearsay that comes into the record without objection, and, unless there is a timely objection or proper motion to strike, hearsay evidence will be admitted. Id. Given this, we cannot find the trial court plainly erred in admitting Officer's testimony that the [first discovered] shooting victim's name was Steven Smith.

Additionally, we cannot find that the trial court plainly erred in permitting Officer's testimony regarding [Smith]'s name because it is a general rule that "[e]vidence of a person's name, or a name by which he is known, is generally not within the rule excluding hearsay evidence." State v. Wallingford, 43 S.W.3d 852, 855 (Mo. [Ct.] App. 2001) (citing State v. Cannon, 692 S.W.2d 357, 359 (Mo. [Ct.] App. 1985)). Testimony regarding a person's name is not considered a conclusion. Id. (citing State v. Deppe, 286 S.W.2d 776, 781 (Mo. 1956)). A witness's answer regarding a name is based on his knowledge, though that knowledge might be gained through hearsay. Id. (internal citations omitted). "'A person's name is the title by which habitually he calls himself and others call him, and though the source of the information as to one's name may be hearsay, yet it is universally relied upon as a source of knowledge.'" Id. (quoting Deppe, 286 S.W.2d at 781, which cited Vol. II WIGMORE ON EVIDENCE, 3d Ed. Section 667(a)). Officer's testimony regarding [Smith]'s name was not inadmissible hearsay evidence, and the trial court did not plainly err in admitting this testimony at trial.

[Petitioner]'s second point is denied.

(Mem. Supplementing Order Affirming J. Pursuant to Mo. S. Ct. Rule 30.25(b), Resp't's Ex. 11, at 9-12 (eighth through twelfth, fourteenth, fifteenth, eighteenth through twentieth, twenty-second through thirty-sixth, thirty-eighth through fortieth, and forty-sixth alterations in original.)

In denying his third point on direct appeal that the trial court erred in admitting Jaysin

Stokes's testimony that he had seen Petitioner with a 9mm handgun and a "Dillinger" handgun

about a month before the crimes, the Missouri Court of Appeals stated:

> As a general rule, evidence of uncharged crimes, wrongs, or acts committed by the accused is inadmissible to show his propensity to commit such crimes. State v. Barton, 998 S.W.2d 19, 28 (Mo. banc 1999). This evidence is inadmissible because showing a defendant's propensity to commit a given crime is not a proper purpose for admitting evidence because it may lead the jury to convict the defendant because of his propensity, regardless of his actual guilt. State v. Danikas, 11 S.W.3d 782, 788 (Mo. [Ct.] App. 1999). Evidence of prior misconduct or uncharged crimes, however, may be admitted if it is logically and legally relevant. State v. Wright, 30 S.W.3d 906, 912-13 (Mo. [Ct.] App. 2000). To be logically relevant, it must have a legitimate tendency to establish directly the defendant's guilt of the charged crime. Id. at 913. To be legally relevant, the probative value of the evidence must outweigh its prejudicial effect. Id. "[I]n the context of determining the legal relevance of uncharged crimes evidence, prejudice is a function of whether the admission of this evidence would cause a jury to convict as to the charged crimes simply because the defendant had engaged in prior bad acts or crimes, regardless of the logically relevant evidence in the case." Danikas, 11 S.W.3d at 788 (internal citations omitted). Additionally, as a general rule, uncharged misconduct is admissible if it tends to show: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common plan or scheme embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; or (5) the identity of the person charged. State v. Hatch, 54 S.W.3d 623, 631 (Mo. [Ct.] App. 2001).

> Counsel moved to exclude [Jaysin Stokes]'s testimony that he had seen [Petitioner] with guns in the past. The trial court denied [Petitioner]'s motion in limine as to this testimony after the State asserted that one of the guns that [Jaysin Stokes] saw [Petitioner] with may have been the crime weapon. The trial court state that it would "be up to the jury to decide whether in fact they are the same guns." At trial, [Jaysin Stokes] testified over Counsel's objection that he had seen [Petitioner] with guns about a month or two before the crimes. [Jaysin Stokes] stated that he had "seen [Petitioner] with a nine millimeter and a Dillinger," which could also be called a Derringer.

- 23 -

[Petitioner] asserts that evidence of possession of firearms is highly prejudicial to a defendant, and as such is not legally relevant. In particular, [Petitioner] cites State v. Jones, in which a defendant's conviction was reversed because the court had allowed the admission of evidence that he possessed a pistol *unrelated* to the crimes with which he was charged. 583 S.W.2d 212, 213 (Mo. [Ct.] App. 1979) (emphasis added). In Jones, the court noted that the test for logical relevancy examines whether the evidence sought to be introduced is "logically pertinent in that it reasonably tends to prove a material fact in issue." Id. at 215 (internal citations omitted). It stated that "[t]he dangerous tendency and misleading probative force of this class of evidence require[s] that its admission should be subjected by the courts to rigid scrutiny," but it noted that "[a] gun found in the possession of an accused which is shown to be the same or similar to the one used in the crime falls squarely within the exception" to the rule that prior bad acts or uncharged crimes are inadmissible. Id. at 215-16 (internal citations omitted). The instant case is easily distinguishable from Jones in that [Jaysin Stokes's] testimony related to guns alleged to be the same or similar to the alleged crime weapons in this case.

[Petitioner]'s cousin[, Ronnie,] testified at trial that he, [Petitioner], and two other men had committed the crimes with which [Petitioner] was charged. He testified that [Petitioner] had two guns on the night they committed the crimes, a nine millimeter and a Derringer. He testified that he saw [Petitioner] leave the crime scene with both guns, and that he saw [Petitioner] shoot [Steven Smith] with the Derringer after the nine millimeter failed to fire. A firearms expert testified that the guns used in the crimes were a nine millimeter semi-automatic and a .38 caliber gun, which could have been a Derringer.

[Jaysin Stokes's] testimony that he had previously seen [Petitioner] with a nine millimeter and a "Dillinger" was highly probative in the instant case because it corroborated the testimony of [Petitioner]'s cousin that [Petitioner] possessed and provided the guns that were used in the crimes and that [Petitioner] was one of the participants in the crimes. Evidence of prior crimes or bad acts is competent to prove the crime charged if it tends to prove the identity of the person charged with the commission of that crime. State v. Herrington, 890 S.W.2d 5, 7 (Mo. [Ct.] App. 1994). In Herrington, for example, the Western District [of the Missouri Court of Appeals] found that evidence that a defendant had possessed a firearm at a time unrelated to the charged crime was relevant and admissible evidence to "establish the identity of the accused as well as the availability to [the defendant] of a means of committing the crime in the manner reported by the victim." Id. at 6-7.

Additionally, the record does not reflect that [Jaysin Stokes]'s testimony regarding [Petitioner]'s gun possession was presented as evidence of [Petitioner]'s bad character intended to prejudice the jury. After Counsel objected to testimony related to [Petitioner]'s prior possession of guns, the prosecutor indicated that he intended [Jaysin Stokes]'s testimony to corroborate [Ronnie]'s testimony. The prosecutor elicited testimony from [Jaysin Stokes] that he had seen [Petitioner] in possession of the guns, but he did not elicit testimony suggesting that [Petitioner] had committed a crime or a specific bad act when he had seen him possess the guns on that prior occasion.

We disagree with [Petitioner]'s assertions that [Jaysin Stokes]'s testimony regarding the guns created an undue prejudice in the minds of the jury such that its prejudicial effect outweighed it probative value as corroborating evidence. [Jaysin Stokes]'s testimony was not erroneously admitted because it was both logically and legally relevant.

(Mem. Supplementing Order Affirming J. Pursuant to Mo. S. Ct. Rule 30.25(b), Resp's Ex. 11, at 13-16 (footnote omitted) (third, seventeenth through nineteenth, and thirty-sixth alterations in original.)

The state appellate court issued its mandate on September 14, 2004. (See, e.g., page 4 of the Docket Sheet for **State v. Wiggins**, No. ED83476, https://www.courts.mo.gov/casenet/cases/searchDockets.do (last visited Feb. 17, 2011).) Petitioner did not file a motion for transfer to the Missouri Supreme Court. (Id.)

On December 12, 2004, Petitioner filed a pro se motion for postconviction relief.[4]

---

[4] In the pro se motion, Petitioner raised the following claims:

(1) that the trial court abused its discretion at the hearing on the motion to withdraw "by not calling every available witness[, including two correctional officers who had responded to the altercation,] before making a judgment or determination" that Petitioner would go to trial represented by" Counsel; by overruling the motion to withdraw "because there existed a clear irreconcilable conflict between [Petitioner] and [Counsel]"; by overruling the objection to Alex Robertson; by

(Resp't Ex. 15, L. F. at 4-21.)   Through counsel, Petitioner subsequently filed an amended

motion for postconviction relief, including a request for an evidentiary hearing.  (Resp'ts Ex.

15, L.F. at 27-61.)  In his amended motion, Petitioner presented five claims.

For his first claim for relief, Petitioner argued that he had a right to the effective

assistance of counsel which was violated by Withdrawal Counsel's failure to adequately

prepare for and litigate Petitioner's interests during the trial court's hearing on the requested

withdrawal and substitution of counsel.  (Mot. Ct. Legal File, Resp'ts Ex. 15, at 29-33.)  For

---

overruling the hearsay objections made to Officer Miller's testimony that someone at the crime scene told him Smith's identity; by overruling the hearsay objections to the introduction of Smith's medical records; in overruling objections to Jaysin Stokes's testimony that he had seen Petitioner with two guns approximately one or two months before the crimes because his description of those guns did not match the guns allegedly used in the crimes; in overruling the Batson challenges; in sustaining the State's objection to questioning of Officer McBride about the fact Frank Bell was not being charged for the crimes; and in overruling the objection to the showing of Robertson's videotape;

(2) Withdrawal Counsel was ineffective during the hearing on the motion to withdraw because she failed to consult with Petitioner and gather evidence before that hearing;

(3) there was a conflict of interest between Counsel and Petitioner;

(4) Counsel was ineffective in failing to propose a jury instruction that the jury should not allow the sight of Petitioner in belly and ankle chains throughout trial to prejudice them, and in failing to investigate and subpoena Smith to "elicit testimony from him in regards to the alleged assault on him";

(5) counsel on direct appeal was ineffective in failing to raise on direct appeal the shackling of Petitioner throughout trial, without a jury instruction about it; in failing to present on direct appeal an affidavit by Petitioner that he "was in fact the victim of [Counsel]"; and in failing to attempt to seek en banc consideration of the direct appeal or in advising Petitioner "how to proceed pro se in his attempt to transfer to the Missouri Supreme Court with his issues"; and

(6) there was a conflict of interest between Petitioner and Withdrawal Counsel at the hearing on the motion to withdraw because she was in the same office as the Counsel.  (Pro se Pet., Mot. Ct. Legal File, Resp'ts Ex. 15, at 5-13.)

his second claim, Petitioner urged he was denied his rights to due process and the effective assistance of counsel in that a conflict of interest existed between Counsel and Petitioner due to their physical altercation prior to trial. (Id. at 37-42.) For his third ground for relief, Petitioner contended he was denied due process and the effective assistance of counsel in that Supervisor asked the Court to shackle Petitioner in four-point restraints, which prejudiced him in the eyes of the jury and impaired the presumption of innocence to which he was entitled. (Id. at 44-46.) For his fourth ground for relief, Petitioner argued he was denied his rights to due process and the effective assistance of counsel in that Counsel did not move to suppress Tyler's clothes and a dental receipt found in a bag at Petitioner's and Ronnie's cousin's home on Minnesota Avenue, which was not the cousin's residence, after the cousin, Terry Wiggins, gave consent to search that home. (Id. at 48-51.) For his fifth claim, Petitioner urged he was denied his rights to due process and effective assistance of counsel in that Counsel failed to investigate and secure the attendance at trial of Charman Lisa McDonald, who would have testified that during the hours the crimes occurred she and Petitioner were at home together.[5]

---

[5] Petitioner's postconviction counsel noted that Petitioner had made other claims in his pro se postconviction motion but "they [were] not the proper subject of a Motion under [Mo. S. Ct.] Rule 29.15, so they are not amended. (Mot. Ct. Legal File, Resp'ts Ex. 15, at 58.) Upon the filing of the timely amended postconviction motion, any claims in the initial pro se motion for postconviction relief were no longer before the motion court except to the extent they were included in the amended motion. See **Tinsley v. State**, 258 S.W.3d 920, 927 (Mo. Ct. App. 2008) ("the only claim which the motion court could have considered and determined was that raised in the amended Rule 29.15 motion for post-conviction relief [because t]he filing of an amended motion superseded [the initial] motion and rendered it a nullity" (citations omitted)); **Day v. State**, 143 S.W.3d 690, 693-94 (Mo. Ct. App. 2004) ("The amended motion supersedes [the initial] motion and renders it a nullity. . . . . Therefore, the allegations of a timely-filed amended motion would be the only matters before the motion court" (citation omitted)); **Leach v. State**, 14 S.W.3d 668, 670-71 (Mo. Ct. App. 2000) (an

(Id. at 53-58.)

At an evidentiary hearing on the motion, the motion court took judicial notice of the proceedings and transcript in Petitioner's criminal case and the materials in Petitioner's postconviction proceeding, heard the testimony of Counsel and of Withdrawal Counsel, admitted several exhibits (id. at 59 and 61), and received the transcripts of Petitioner's and Supervisor's depositions. (Mot. Hr'g Tr., Resp'ts Ex. 12, at 2, 59-61; Pet'r Dep., Resp'ts Ex. 13; Supervisor's Dep., Resp'ts Ex. 14.)

The motion court subsequently entered findings of fact and conclusions of law denying the postconviction motion (judgment). (Mot. Legal File, Resp'ts Ex. 15, at 62-74.)

Petitioner appealed the denial of his postconviction motion. (Pet'r Br. on Postconviction Appeal, Resp'ts Ex. 16.) In Petitioner's first point on appeal, Petitioner urged the motion court erred in denying his postconviction motion after a hearing because his rights to due process and the effective assistance of counsel were violated due to Counsel's actual conflict of interest. (Id. at 16, 19.) For his second point, Petitioner argued the motion court erred in denying his postconviction motion after a hearing because his rights to due process and the effective assistance of counsel were violated in that Supervisor requested that Petitioner remain shackled during trial despite the presumption of dangerousness such restraint communicated to the jury. (Id. at 17, 24.) For his final point on appeal, Petitioner argued the motion court clearly erred in denying his postconviction motion after a hearing because

_____

allegation not included in the amended motion for postconviction relief is "not properly before the motion court").

Petitioner's rights to due process and the effective assistance of counsel were violated by Counsel's failure to move to suppress physical evidence on the grounds its seizure was illegal as it was based on the consent of a woman the police knew was not a resident of the searched premises.  (Id. at 18, 29.)

The Missouri Court of Appeals for the Eastern District of Missouri found no error and affirmed the denial of Petitioner's postconviction motion in a summary per curiam order, dated October 17, 2006, explaining its decision in a memorandum sent only to the parties.  (Order and Mem. Supplementing Order Affirming J. Pursuant to Mo. S. Ct. Rule 84.16(b), Resp't's Ex. 18.)  With respect to the first point that Counsel had a conflict of interest, the appellate court stated:

> The record reveals that [Petitioner] had been charged with committing several violent offenses, including the premeditated murder and robbery of [Tyler] and the shooting of [Tyler]'s girlfriend[, Jones].  [Petitioner]'s trial was set to begin on a Monday in July 2003, and Counsel, who worked for the Public Defender's Office, had been assigned to represent [Petitioner].  On the Thursday afternoon immediately prior to trial, Counsel met with [Petitioner] at the jail where [Petitioner] was being held. [Petitioner] had asked Counsel to bring some videotapes of his co-defendants and to watch them with [Petitioner], even though [Petitioner] already had watched the videotapes.  During their meeting, [Petitioner] asked Counsel if he could obtain a continuance.  Counsel replied that they did not need to get a continuance because they were ready for trial.  [Petitioner] subsequently thanked Counsel for coming to see him and shook Counsel's hand.  As Counsel gathered his materials into both arms and prepared to leave, [Petitioner] suddenly punched Counsel in the nose and chin.  Counsel attempted to defend himself, but [Petitioner] punched him in the face again before guards intervened.

> Counsel subsequently filed a motion to withdraw as [Petitioner]'s attorney and consulted with his supervisor, the Deputy Trial Division Director for the Missouri State Public Defender System (Supervisor).  The motion was

heard on Monday morning, just before trial began. Supervisor attended the hearing and stated it was the position of the Public Defender System that Counsel should be allowed to withdraw from the case but also acknowledged that the trial court had other sanctions available, including ordering [Petitioner] to be physically restrained during trial, to ensure "this sort of thing does not happen again." Both the trial court and Supervisor expressed concern that granting Counsel's motion to withdraw would be tantamount to sending a message to other defendants encouraging them to physically assault their attorneys if they wanted a change of attorney or a last-minute continuance. The trial court denied Counsel's motion to withdraw and commented that, although there was a conflict between [Petitioner] and Counsel, "[t]he condition which created the conflict was a result of the misconduct of [Petitioner], and in the Court's opinion, [Petitioner] cannot be permitted to benefit from his misconduct." To ensure Counsel's safety during the trial, the trial court ordered [Petitioner]'s hands and feet to be restrained, leaving one hand free so he could write. The trial court further ordered Supervisor to sit between [Petitioner] and Counsel and facilitate communication between them at trial. The trial court commented that most of the restraints were covered by counsel table and that the way [Petitioner] was positioned at the table kept the restraints out of the view of the jurors. The trial court checked with [Petitioner] and his attorneys several times during trial to ensure that [Petitioner] was not having any difficulties communicating with his attorneys.

At the evidentiary hearing on [Petitioner's postconviction] motion, Counsel testified that he had been angry with [Petitioner] for punching him and had wanted to withdraw from the case. Counsel also testified that, when the trial court ordered him to remain on the case, Counsel did his best to win, especially because he had worked hard to prepare and because he wanted to enhance his reputation as an attorney by winning. Counsel testified that, despite [Petitioner]'s behavior, he had conducted [Petitioner]'s defense to the best of his ability.

In its findings of fact and conclusions of law, the motion court found that although a conflict between [Petitioner] and Counsel had been created by [Petitioner]'s misconduct, the conflict neither carried over to the trial nor affected the quality of Counsel's representation of [Petitioner]. The motion court found the record of the trial reflected that Counsel had participated fully in the presentation of [Petitioner]'s defense, including making appropriate motions, selecting jurors, making objections, and conducting cross-examination. In making its finding that [Petitioner] was not prejudiced by Counsel's request

that he be shackled during trial, the motion court noted there was no credible evidence the shackles were visible to the jury and [Petitioner]'s "unprovoked attack on his lawyer just days prior to trial created a compelling state interest" requiring the trial court to establish special conditions to maintain a safe environment within which Counsel could competently and fervently represent [Petitioner].

\* \* \*

. . . To obtain a change of counsel on the eve of trial, the defendant must demonstrate an irreconcilable conflict with his appointed counsel. [State v. Williams, 9 S.W.3d 3, 10 (Mo. Ct. App. 1999)]. To prevail on a claim of irreconcilable conflict with his trial counsel, the defendant must produce objective evidence of a total breakdown in communication. Id.; Owsley, 959 S.W.2d at 792. The defendant cannot prevail where he created the irreconcilable conflict through his own misconduct. [Williams, 9 S.W.3d at 10]; Owsley, 959 S.W.2d at 793.

Here [Petitioner]'s claim is without merit. The record clearly demonstrates that, in accordance with the motion court's findings, [Petitioner] created the alleged conflict between him and Counsel through his own misconduct. The record also demonstrates that, in spite of [Petitioner]'s misconduct and Counsel's initial desire to withdraw his representation, Counsel represented [Petitioner] effectively and competently. Point denied.

(Mem. Supplementing Order Affirming J. Pursuant to Mo. S. Ct. Rule 84.16(b), Resp'ts Ex. 18, at 3-6 (footnote omitted) (eighteenth alteration in original).)

The Missouri Court of Appeals found the second point, that the motion court erred because Supervisor failed to meet the standard of a reasonably competent attorney under similar circumstances by asking that Petitioner be shackled during trial, was

wholly without merit because the record reveals that Supervisor did not represent [Petitioner] at the time she made the request and did not act as co-counsel during [Petitioner]'s trial. Supervisor became involved in [Petitioner]'s case only after [Petitioner] physically attacked Counsel, who was [Petitioner]'s sole attorney, and Counsel consulted with Supervisor. During the hearing on

- 31 -

Counsel's motion to withdraw, Supervisor was present and specifically informed the trial court that she was there on behalf of Counsel and the trial division of the Public Defender's System. Supervisor stated the position of the Public Defender System was that Counsel should be allowed to withdraw from the case, but she also acknowledged that the trial court had other sanctions available, including ordering [Petitioner] to be physically restrained during trial, to ensure "this sort of thing does not happen again." The trial court subsequently denied Counsel's motion to withdraw, and the following transpired:

> [TRIAL COURT]: I am ordering [Counsel] to comply with the Code of Professional Conduct and to provide [Petitioner] with effective assistance of counsel. I have had numerous attorneys before me in the past, both Public Defenders and private attorneys, who have had conflicts with their clients, who have literally told me they hated their clients, they couldn't even communicate with their clients, and yet they have provided effective assistance in terms of providing effective trial assistance.

> The way in which we handled that in the past and the way in which we're going to handle that at the present time is that [Petitioner] will be provided with a pad of paper, and if he needs to jot notes to [Counsel], he will be provided with one pen that he will be allowed to use for purposes of writing notes which will then be handed to [Counsel].

> In order to assure the safety of the lawyer in this case, [Petitioner] will be tethered. In other words, his hands will be belly-chained, his feet will be tethered throughout the trial of this case. He'll have enough space to be able to write any notes that he desires.

> It's my understanding that there is to be co-counsel with [Counsel] in this case, is that correct?

> [SUPERVISOR]: Judge, I will be sitting with [Counsel] on this case, *but I do want to make the record clear that my involvement in this case began when [Counsel] informed me of this situation on Thursday. I will assist [Counsel] in taking*

*notes. I will be here so that [Counsel] does not have to sit next to [Petitioner]. However, I have no substantive knowledge of the case. I am not prepared to step in or to assist in terms of the substantive issues with respect to the case because I'm not familiar with the case.*

THE COURT: There's nothing before this Court to indicate that [Counsel] is not competent or capable of substantively and procedurally handling the case. The issue that has been raised is the ability to get communication between [Petitioner] and [Counsel] throughout the trial of the case in order to facilitate effective counsel, and [Supervisor], since you will be here, you will facilitate in that respect.

. . .

Furthermore, in her deposition for the evidentiary hearing on [Petitioner]'s motion, Supervisor testified that she only assisted at [Petitioner]'s trial by helping [Petitioner] take notes and communicate with Counsel and that she did not make decisions concerning trial strategy – those decisions were left to Counsel. Although [Petitioner] attempts to characterize Supervisor as his "co-counsel," the evidence in the record clearly indicates that Supervisor acted only as a facilitator for communication between [Petitioner] and Counsel. Accordingly, the [motion] court did not clearly err in denying [Petitioner]'s claim that Supervisor rendered ineffective assistance of counsel. Point denied.

(Mem. Supplementing Order Affirming J. Pursuant to Mo. S. Ct. Rule 84.16(b), Resp't Ex. 18, at 6-8 (emphasis in original) (seventh, eleventh, twelfth, fifteenth through nineteenth, twenty-first, twenty-third, and twenty-fourth alterations in original.)

In his third point, Petitioner argued the motion court erred in denying his postconviction motion after a hearing because his Counsel was ineffective in failing to move to suppress physical evidence of his guilt in that the evidence was illegally seized. Specifically, Petitioner argued the evidence was seized based on a consent to search provided

by a person whom the police knew was not a resident of the premises. For this point, the

Missouri Court of Appeals found:

> During their investigation of [Petitioner]'s involvement in the crimes in the underlying case, police officers went to a house at 3548 Minnesota looking for [Petitioner]. When the officers arrived, the occupant, Terry Wiggins (Terry), was there and signed a consent form granting police permission to search the interior of the home. Between a mattress and box spring, the officers found a bag containing [Tyler's] clothing and a receipt from a dentist's office for the implantation of gold crowns on [Petitioner]'s two front teeth. At trial, the State presented evidence linking [Petitioner] to [Tyler]'s clothing and establishing that [Petitioner] had received gold crowns on his front teeth around the time of [Tyler]'s murder.

> Prior to trial, Counsel discussed with [Petitioner] whether to file a motion to suppress the items seized from the house at 3548 Minnesota. [Petitioner] told Counsel that [Petitioner] did not live at a particular address but had stayed with Terry at the house on Minnesota in the days immediately before the night of the crimes with which [Petitioner] was charged. [Petitioner] also initially told Counsel that Terry was [Petitioner]'s alibi witness for the time of the offenses. Counsel believed that Terry lived at the house and, therefore, that Terry's consent to search the house was valid. Counsel and his investigator attempted to contact Terry to determine whether she would be an alibi witness at trial, but they were unable to find her. During his preparation for trial, Counsel reviewed all of the police reports and the evidence return sheets. Counsel did not notice any discrepancy between the address listed on the evidence return sheet and the address of the house police had searched. Furthermore, even if he had noticed such a discrepancy, Counsel knew that the address on the evidence return sheet was part of the pedigree information police had collected on Terry, which Counsel believed was usually obtained from driver's license records and not always current. Based on the information [Petitioner] had relayed to him about the address where he had been staying and the lack of any evidence indicating Terry did not have the authority to consent to a police search of the house at 3548 Minnesota, Counsel concluded that the search was valid and that filing a motion challenging the search would be futile.

> Trial counsel will not be found to be ineffective for failing to investigate and file a meritless motion to suppress evidence. <u>Eddy v. State</u>, 176 S.W.3d 214, 218 (Mo. [Ct.] App. . . . 2005). To prevail on a claim of ineffective

assistance of counsel on such a claim, the [petitioner] must demonstrate the grounds on which the motion to suppress would have been successful. Id.

Generally, searches conducted without a search warrant are unreasonable and violate a defendant's Fourth Amendment rights. State v. Lewis, 17 S.W.3d 168, 170 (Mo. [Ct.] App. . . . 2000). A search conducted pursuant to a valid consent, however, is constitutionally permitted. Id. It is well settled that the consent to search by a person who possesses "common authority" over the premises is valid as against the absent, non-consenting person with whom authority is shared, as long as the consent is voluntary and not induced by fraud or coercion. Id. Law enforcement officers may carry out a valid warrantless search based on consent if the officers reasonably believed the person giving consent had the authority to do so even where the officer's belief is later proved to be erroneous. Id. Using an objective standard, we determine whether the consent was valid by asking if the facts available to the officer at the moment warrant a person of reasonable caution to believe that the consenting party had authority over the premises. Id., citing Illinois v. Rodriguez, 497 U.S. 177 . . . (1990).

Here, [Petitioner] has failed to show, by a preponderance of the evidence, that a motion to suppress the evidence seized during the search of the house at 3548 Minnesota would have been successful. Based on the information Counsel had been given by [Petitioner] and based on his own investigation, Counsel concluded that a challenge to the propriety of the search would be futile because Terry had authority to consent to the search as she was the person who lived in the house. Using an objective standard, our review of the record compels the same conclusion. Thus, the trial court did not clearly err in denying [Petitioner]'s motion. Point denied.

(Mem. Supplementing Order Affirming J. Pursuant to Mo. S. Ct. Rule 84.16(b), Resp'ts Ex. 18, at 8-10.) The state appellate court issued its mandate on November 9, 2006. (Mandate, Resp'ts Ex. 19.)

On July 16, 2007, Petitioner timely filed this habeas proceeding presenting sixteen grounds for relief: the trial court erred in not allowing Counsel to withdraw based on a conflict of interest (ground one); Counsel was ineffective for having Petitioner in four-point restraints

during trial (ground two); the trial court erred in allowing the hearsay testimony of Officer Miller as to the identity of Smith (ground three); Withdrawal Counsel provided ineffective representation of Petitioner at the hearing on the motion to allow Counsel to withdraw, in that she did not consult with Petitioner or gather evidence before that hearing (ground four); the trial court erred in overruling an objection to Robertson (ground five); trial court erred in overruling a hearsay objection to Smith's medical records (ground six); trial court erred in admitting evidence that about one month before the crimes Petitioner possessed guns of the type used in the crimes (ground seven); trial court erred in overruling Petitioner's <u>Batson</u> challenge (ground eight); the trial court erred in overruling Petitioner's offer of proof that Bell, an alleged co-defendant, had not been charged at the time of trial (ground nine); the trial court erred in allowing use of Robertson's videotaped statements to impeach Robertson (ground ten); Counsel was ineffective for not offering a jury instruction that the jury should rule fairly despite Petitioner being shackled (ground eleven); Counsel had a conflict of interest in that he threatened Petitioner and physically and verbally assaulted Petitioner (ground twelve); Counsel was ineffective in failing to investigate and elicit testimony from Smith before trial (ground thirteen); Withdrawal Counsel had a conflict of interest at the hearing on the motion to withdraw because she worked for the same office as Counsel (ground fourteen); Counsel was ineffective for not objecting to "false evidence" of a consent to search form (ground fifteen); and Counsel was ineffective for failing to suppress evidence seized from Terry's apartment (ground sixteen). Respondents argue that several of these grounds for relief are

procedurally barred and the others lack merit. The Court will address Respondents' procedural bar arguments first.

## Discussion

Procedural Bar. Respondents argue grounds for relief five (trial court erred in overruling an objection to Robertson), six (trial court erred in overruling Petitioner's hearsay objection to Smith's medical records), eight (trial court erred in overruling Petitioner's Batson challenges), nine (trial court erred in overruling Petitioner's offer of proof that Bell, an alleged co-defendant, had not been charged at the time of trial), and ten (trial court erred in allowing use of Robertson's videotaped statement to impeach Robertson) are procedurally barred because they were not raised on direct appeal. Respondents also contend that grounds for relief four (Withdrawal Counsel provided ineffective assistance by not consulting with Petitioner or gathering evidence before the hearing on the motion to withdraw), eleven (Counsel was ineffective for not offering a jury instruction that the jury should rule fairly despite Petitioner being shackled throughout trial), twelve (Counsel had a conflict of interest in that he threatened, physically assaulted, and verbally assaulted Petitioner); thirteen (Counsel was ineffective because he failed to investigate and elicit testimony from Smith), and fourteen (Withdrawal Counsel had a conflict of interest at the hearing on the motion to withdraw because she worked for same office as Counsel) are procedurally barred because Petitioner did not raise those claims in his postconviction appeal. Additionally, Respondents urge that ground for relief thirteen is procedurally barred because it was not raised in Petitioner's

postconviction motion.[6]

It is well established that "[t]o be eligible for federal habeas corpus relief, a state prisoner must first exhaust his state law remedies and fairly present the facts and substance of his habeas claim to the state court." **Carney v. Fabian**, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal quotation marks omitted) (quoting Middleton v. Roper, 455 F.3d 838, 855 (8th Cir. 2006)); see also **Baldwin v. Reese**, 541 U.S. 27, 29 (2004). "'If a petitioner has not presented his habeas corpus claim to the state court, the claim is generally defaulted.'" **Carney**, 487 F.3d at 1096 (quoting Barrett v. Acevedo, 169 F.3d 1155, 1161 (8th Cir. 1999) (en banc)); accord **Malone v. Vasquez**, 138 F.3d 711, 716 (8th Cir. 1998). "Claims that have not been presented to the state courts, and for which there are no remaining state remedies, are procedurally defaulted." **Skillicorn v. Luebbers**, 475 F.3d 965, 976 (8th Cir. 2007).

In Missouri, alleged trial court errors, including constitutional claims of trial court error, must be raised on direct appeal. See, e.g., **Middleton v. State**, 103 S.W.3d 726, 740 (Mo. 2003) (en banc) (alleged trial court error in admitting letter "constitutes a claim of trial

---

[6] Petitioner presented this claim for relief in his pro se postconviction motion, see Mot. Legal File, Resp'ts Ex. 15, at 11, but it was not set forth as a ground for relief in his amended postconviction motion, see id. at 58, and, as noted earlier, may be deemed waived. See **Tinsley**, 258 S.W.3d at 927 ("the only claim which the motion court could have considered and determined was that raised in the amended Rule 29.15 motion for post-conviction relief [because t]he filing of an amended motion superseded [the initial] motion and rendered it a nullity" (citations omitted)); **Day**, 143 S.W.3d at 693-94 ("The amended motion supersedes [the initial] motion and renders it a nullity. . . . . Therefore, the allegations of a timely-filed amended motion would be the only matters before the motion court" (citation omitted)); **Leach**, 14 S.W.3d at 670-71 (an allegation not included in the amended motion for postconviction relief is "not properly before the motion court"). Nevertheless, even if it is considered as presented to the motion court, it was not included in Petitioner's postconviction appeal.

error in the admission of [a] document [that] must be raised on direct appeal and [is] not cognizable in a post-conviction motion"); **Griffin v. State**, 794 S.W.2d 659, 661 (Mo. 1990) (en banc) (alleged trial court error in allowing certain statements of prosecutor during closing argument is an "issue[] that w[as] before the trial court in the course of [the] criminal trial. They are allegations of trial errors which are for review by direct appeal"); **Phillips v. State**, 214 S.W.3d 361, 364 (Mo. Ct. App. 2007) (finding merit in State's argument that a postconviction claim that the trial court erred in failing to allow the defendant to represent himself at trial should have been raised on direct appeal because it was alleged trial court error known to the defendant and was not cognizable in a postconviction proceeding). Therefore, if trial court errors are not raised on direct appeal, they are defaulted.

A postconviction proceeding is, however, the exclusive procedure for pursuing in state court ineffective assistance of counsel claims, and successive postconviction motions are not permitted. Mo. S. Ct. Rule 29.15(a) and (l); **Moore-El v. Luebbers**, 446 F.3d 890, 896 (8th Cir. 2006). Moreover, the Missouri Supreme Court Rules expressly provide for an appeal from a postconviction motion court's ruling. Mo. S. Ct. Rule 29.15(k). Claims that should have been but were not presented on appeal from a denial of a postconviction motion are procedurally defaulted. See <u>Turnage v. Fabian</u>, 606 F.3d 933, 936, 940-41, 942 (8th Cir. 2010) (not addressing the merits of a federal claim that had not been fairly presented in a brief to the state supreme court after the denial of postconviction relief); **Storey v. Roper**, 603 F.3d 507, 523-24 (8th Cir. 2010) (not addressing the merits of a claim that the petitioner had not

pursued on appeal from the denial of postconviction relief), cert.denied, 79 U.S.L.W. 3492 (U.S. Feb. 28, 2011) (No. 10-8163); **Interiano v. Dormire**, 471 F.3d 854, 856 (8th Cir. 2006) (claims not presented in a Rule 29.15 postconviction motion or included in appeal are procedurally defaulted); **Osborne v. Purkett**, 411 F.3d 911, 919 (8th Cir. 2005) (claim raised in a Rule 29.15 postconviction motion but not presented on appeal was procedurally barred); **Sweet v. Delo**, 125 F.3d 1144, 1150 (8th Cir. 1997) (a claim not raised in the postconviction appeal was defaulted); **Lowe-Bey v. Groose**, 28 F.3d 816, 818 (8th Cir. 1994) ("The failure to raise the ineffective assistance claims in an appeal from the denial of [the postconviction motion] raises a procedural bar to pursuing those claims in federal court").

A review of the record shows that Petitioner did not pursue grounds five, six, eight, nine, and ten, all of which allege trial court error, on direct appeal. The record also discloses that Petitioner did not pursue grounds four, eleven, twelve, thirteen, and fourteen, which challenge the representation provided by Counsel and Withdrawal Counsel, in his postconviction appeal. These claims are defaulted.

Additionally, the claim in ground twelve is defaulted because the basis for that claim as pursued in this federal habeas proceeding has not been presented to the state courts. **King v. Kemna**, 266 F.3d 816, 821 (8th Cir. 2001) (quoting Flieger v. Delo, 16 F.3d 878, 885 (8th Cir. 1994)), for the proposition that, to preserve a claim for federal review, a habeas petitioner must raise both the factual and legal bases for the claim in the state courts and sua sponte finding a habeas claim procedurally barred because the basis for it had not been presented to

the state courts). In ground twelve Petitioner urges Counsel had a conflict of interest in that he allegedly threatened Petitioner and physically and verbally assaulted Petitioner. That claim is not the same conflict of interest claim that was raised before the state courts, that Counsel had a conflict of interest because Petitioner assaulted Counsel. <u>See</u>, <u>e.g.</u>, Mem. Supplementing Order Affirming J. Pursuant to Mo. S. Ct. Rule 30.25(b), Resp'ts Ex. 11, at 2-8.) Therefore, the claim in ground twelve is also defaulted because the factual basis of that claim was not presented to the state courts.

"Unless a habeas petitioner shows cause and prejudice or that he is actually innocent of the charges, a [federal habeas] court may not reach the merits of procedurally defaulted claims in which the petitioner failed to follow applicable state procedural rules in raising the claims." **Skillicorn**, 475 F.3d at 976-77; <u>see</u> <u>also</u> **Sawyer v. Whitley**, 505 U.S. 333, 338 (1992). "'[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" **Greer v. Minnesota**, 493 F.3d 952, 957 (8th Cir. 2007) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986)). There is no exhaustive catalog of the objective impediments, nor have the precise contours of the cause requirement been clearly defined. **Ivy v. Caspari**, 173 F.3d 1136, 1140 (8th Cir. 1999). What has been established is that a "fail[ure] to raise [a] claim despite recognizing it, does not constitute cause for a procedural default." **Murray**, 477 U.S. at 486.

To the extent Petitioner may argue that alleged ineffectiveness of his direct appeal

counsel in failing to raise issues on direct appeal constitutes cause sufficient to avoid the procedural bar for grounds five, six, eight, nine, and ten, that argument lacks merit because the claimed ineffective assistance of direct appeal counsel was not presented to the state motion court as an independent claim. **Edwards v. Carpenter**, 529 U.S. 446 (2000); **Williams v. Kemna**, 311 F.3d 895, 897 (8th Cir. 2002). A claim of ineffective assistance of direct appeal counsel must be raised in a postconviction motion, Mo. S. Ct. R. 29.15(a), and then on postconviction appeal. See, e.g., **Osborne**, 411 F.3d at 919. Petitioner did not do that, so cause is not established by any failure of Petitioner's direct appeal counsel.

To the extent Petitioner may contend that his postconviction appellate counsel's conduct in failing to raise grounds four, eleven, twelve, thirteen, and fourteen on appeal in the postconviction proceeding constitutes cause, the Court disagrees. The "ineffective assistance of postconviction counsel is not a cause for procedural default."[7] **Oglesby v. Bowersox**, 592 F.3d 922, 925-26 (8th Cir.), cert. denied, 131 S. Ct. 207 (2010); accord **Zeitvogel v. Delo**, 84 F.3d 276, 279 (8th Cir. 1996) ("[t]o establish cause, [the petitioner] must show something beyond the control of postconviction counsel, like State interference, actually prevented postconviction counsel from raising the claims and presenting the evidence in state court"). In **Interiano**, the Eighth Circuit did not excuse a default caused in part by postconviction counsel's failure to raise known claims in the appeal from the denial of the postconviction

---

[7] Therefore, any argument by Petitioner that his postconviction counsel failed to include in the amended postconviction motion certain grounds set forth in Petitioner's pro se postconviction motion does not establish cause for the procedural default or otherwise provide a basis for considering the merits of those pro se claims.

motion.  **Interiano**, 471 F.3d at 857.  Similarly, the omission from Petitioner's postconviction appeal of the issues now presented in grounds four, eleven, twelve, thirteen, and fourteen is not excused.

Because no cause has been established for Petitioner's procedural default, it is unnecessary to consider whether he has demonstrated prejudice.  **Abdullah v. Groose**, 75 F.3d 408, 413 (8th Cir. 1996) (en banc).

Petitioner's defaulted grounds may be reached absent a showing of cause and prejudice for his procedural default if he establishes that a failure to consider the claims' merits will result in a fundamental miscarriage of justice.  "Procedurally barring a claim that establishes actual innocence is considered a fundamental miscarriage of justice."  **Cox v. Burger**, 398 F.3d 1025, 1031 (8th Cir. 2005).  A showing of actual innocence requires new evidence and a "show[ing] that 'it is more likely than not that no reasonable juror would have convicted him in light of th[at] new evidence.'" **Osborne**, 411 F.3d at 920 (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)).  "'Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim.'" **Cagle v. Norris**, 474 F.3d 1090, 1099 (8th Cir. 2007) (quoting Schlup, 513 U.S. at 316).

Petitioner does not submit any new evidence of his actual innocence, nor does he allege that such evidence exists.

For the foregoing reasons, the claims presented in grounds four, five, six, eight, nine,

ten, eleven, twelve, thirteen, and fourteen in Petitioner's habeas petition are procedurally barred and will not be considered on their merits. The Court will consdier the merits of the remaining six grounds, which are not procedurally barred.

Merits - Standard of Review. Title 28 U.S.C. § 2254(d) mandates that a federal court grant habeas relief on a claim that was adjudicated on its merits by the State courts *only* "when the state court's decision [is] contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court [of the United States], or the [state court] decision [is ]based on an unreasonable determination of the facts in light of the evidence presented in the state court." **de la Garza v. Fabian**, 574 F.3d 998, 1001 (8th Cir. 2009), cert. denied, 130 S. Ct. 2412 (2010); accord **Christenson v. Ault**, 598 F.3d 990, 994 (8th Cir. 2010). "A state court decision is contrary to clearly established federal law if it reaches a conclusion opposite to one reached by the [United States] Supreme Court on a question of law or decides the case differently than the [United States] Supreme Court has decided a case with a materially indistinguishable set of facts." **de la Garza**, 574 F.3d at 1001; accord **Losh v. Fabian**, 592 F.3d 820, 823 (8th Cir. 2010). "A state court decision involves an unreasonable application of clearly established federal law if, in the federal court's independent judgment, the relevant state court decision not only applied clearly established federal law incorrectly, but also did so unreasonably." **de la Garza**, 574 F.3d at 1001. "The unreasonable application inquiry is an objective one." **Id.**; see **Losh**, 592 F.3d at 823 (under the unreasonable application clause of § 2254, a habeas petition may be granted "only if the

state court applied the correct governing legal principle in an objectively unreasonable manner").

Importantly, "[o]nly rulings in Supreme Court decisions issued before the state court acts are considered clearly established federal law, for a state court does not act contrary to or unreasonably apply clearly established federal law if there is no controlling Supreme Court holding on the point." **Losh**, 592 F.3d at 823 (citations omitted).  The state court does not need to cite to Supreme Court cases, "'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" **Revels v. Sanders**, 519 F.3d 734, 739 (8th Cir. 2008)) (quoting Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam)).

"[T]he 'summary nature' of the [state court's] discussion of [a] federal constitutional question does not preclude application of [§ 2254's] standard." **Brown v. Luebbers**, 371 F.3d 458, 462 (8th Cir. 2004) (en banc).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law precedential principles to the contrary." **Harrington v. Richter**, 131 S. Ct. 770, 784-85 (2011).  Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" **Id.** at 785.

Additionally, in a federal habeas action pursued by a state prisoner, "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by the petitioner by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  The deference owed by

a federal habeas court to a state court's findings of fact includes deference to state court credibility determinations, **Smulls v. Roper**, 535 F.3d 853, 864 (8th Cir. 2008) (en banc), and to "[a] state court's findings of fact made in the course of deciding" an ineffective assistance of counsel claim, **Odem v. Hopkins**, 382 F.3d 846, 849 (8th Cir. 2004). Moreover, the presumption of correctness of findings of fact applies to the factual determinations made by both the state trial court and the state appellate court. **Smulls**, 535 F.3d at 864-65.

Ground One - Trial Court Erred in Not Allowing Trial Counsel to Withdraw Due to a Conflict of Interest. Respondents point out that the trial court, after a hearing, and the Missouri Court of Appeals on direct appeal rejected this claim on its merits.

On direct appeal, the Missouri Court of Appeals concluded that the record showed "the trial court did what it was required to do . . . to ensure that there was not a total breakdown of communication between [Petitioner] and Counsel necessitating Counsel's withdrawal," that Petitioner and his Counsel "were able to communicate before and during trial, and [that] there is no indication of a 'total breakdown in communication' between them [so Petitioner] has failed to show there was an irreconcilable conflict between them that would require Counsel's withdrawal." (Mem. Supplementing Order Affirming J. Pursuant to Mo. S. Ct. Rule 30.25(b), Resp'ts Ex. 11, at 7-8.) The appellate court also noted that Petitioner was not entitled to relief because he had "created the alleged irreconcilable conflict through his own misconduct." Id. at 8.

The United States Supreme Court has recognized that the Sixth Amendment right to

counsel includes "a correlative right to representation that is free from conflicts of interest."[8]

**Wood v. Georgia**, 450 U.S. 261, 271 (1981); **Smith v. Lockhart**, 923 F.2d 1314, 1320 (8th Cir. 1991).  Conflicts may arise due to an attorney's serial or multiple representation of defendants.  See, e.g., **Cuyler v. Sullivan,** 446 U.S. 335, 345-50 (1980).  In those instances, prejudice is presumed because, in such circumstances, the attorney is breaching one of the most basic of counsel's duties, the duty of loyalty.  **Strickland v. Washington**, 466 U.S. 668, 692 (1984) (citing Cuyler, 446 U.S. at 345-50 ).  To be entitled to such a presumption, a petitioner must "demonstrate[] that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'"  **Id.** (quoting Cuyler, 446 U.S. at 350, 348)); **Winfield v. Roper**, 460 F.3d 1026, 1039 (8th Cir. 2006) (quoting Cuyler, 446 U.S. at 348)); see also **Mickens v. Taylor**, 535 U.S. 162, 166-76 (2002); **Koste v. Dormire**, 345 F.3d 974, 983 (8th Cir. 2003) (to obtain relief, a federal habeas petitioner need not demonstrate prejudice if the petitioner "shows that a conflict of interest *actually affected the adequacy of [the attorney's] representation*" (quoting Mickens, 535 U.S.

---

[8]  When a conflict of interest between a defendant and the defendant's trial attorney is presented to a trial court, the trial court must make an inquiry into that conflict regardless of its nature.  See **Caban v. United States**, 281 F.3d 778, 783 (8th Cir. 2002) (citing Wood, 450 U.S. at 272 n.18); **Atley v. Ault**, 191 F.3d 865, 871-74 (8th Cir. 1999) (granting habeas relief upon finding the trial court violated its constitutional duty to conduct an adequate inquiry into defense counsel's conflict of interest upon receiving notice of the defense attorney's future employment with the prosecutor's office).  Here, the trial court conducted a hearing regarding the conflict of interest promptly upon receiving notice of it, and no challenge to the manner in which the trial court conducted that hearing is presented in this proceeding.

at 171) (emphasis in original)).[9]  "To be successful [the petitioner] would have to identify an actual and demonstrable adverse effect, 'not merely an abstract or theoretical one.'" **Winfield**, 460 F.3d at 1039 (quoting United States v. Flynn, 87 F.3d 996, 1001 (8th Cir. 1996)).  This requires a petitioner "to identify a plausible alternative defense strategy or tactic that defense counsel might have pursued, show that the alternative strategy was objectively reasonable under the facts of the case, and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." **Id.** (internal quotation marks omitted) (quoting Covey, 377 F.3d at 908).  To the extent the presumption of prejudice applies in this case, Petitioner has not shown that Counsel should have pursued a different tactic or defense strategy that was reasonable under the circumstances and not pursued due to the alleged conflict between Counsel and Petitioner.

It is not clear, however, that a presumption of prejudice applies to conflicts beyond those involving an attorney's multiple or serial representation of defendants.  **Covey**, 377 F.3d at 907 (questioning whether the Eighth Circuit applies Cuyler beyond conflicts involving multiple or serial representation); **Wemark v. Iowa**, 322 F.3d 1018, 1021 (8th Cir. 2003) (questioning whether the Eighth Circuit and Supreme Court permit the application of Cuyler's presumption of prejudice in situations other than when counsel represents more than one

---

[9]  The Eighth Circuit has noted that, based on a statement in **Mickens**, 535 U.S. at 172 n.5, a court should not consider the actual conflict separate from the adverse effect.  See **Covey v. United States**, 377 F.3d 903, 908 n.3 (8th Cir. 2004).  Rather, the court should determine an "actual conflict" exists for Sixth Amendment purposes when the conflict of interest adversely affects counsel's performance. Id.

defendant, and noting but not addressing the merits of a claimed conflict between the attorney and the defendant upon the defendant's disclosure to the attorney of the location of the murder weapon); **Caban**, 281 F.3d at 782 (stating the Eighth Circuit "has never applied <u>Cuyler's</u> rule of presumed prejudice outside the context of multiple representation of codefendants or serial defendants"). Because the conflict at issue here does not involve an attorney's serial or multiple representation of defendants, the presumption of prejudice may be inapplicable.

When the presumption of prejudice does not apply to a conflict of interest situation, the Court determines whether the prejudice requirement of <u>Strickland</u> is satisfied. **United States v. Young**, 315 F.3d 911, 914 n.5 (8th Cir. 2003) ("where the alleged conflict involves ethical issues other than multiple or serial representation, this Circuit has held that <u>Strickland</u> is the appropriate standard"); <u>see</u> <u>also</u> discussion of case law in **Wemark**, 322 F.3d at 1021. To establish prejudice under <u>Strickland</u>, a petitioner must demonstrate "'a reasonable probability that, but for counsel's [conflict], the result of the proceeding would have been different.'" **Armstrong v. Kemna**, 590 F.3d 592, 595-96 (8th Cir. 2010) (quoting <u>McCauley-Bey v. Delo</u>, 97 F.3d 1104, 1105 (8th Cir. 1996)), <u>cert. denied</u>, 130 S.Ct. 3369 (2010). "'A reasonable probability is [a probability] sufficient to undermine confidence in the outcome.'" **Id.** at 596 (quoting <u>McCauley-Bey</u>, 97 F.3d at 1105); <u>accord</u> **Carroll v. Schriro**, 243 F.3d 1097, 1100 (8th Cir. 2001) (quoting <u>Strickland</u>, 466 U.S. at 694).

When a petitioner has not shown an adverse impact under <u>Cuyler</u>, such as in this case, "he is necessarily unable to prove prejudice under the more rigorous <u>Strickland</u> standard

typically governing ineffective assistance of counsel claims."  **Winfield**, 460 F.3d at 1040.

Additionally, in light of the evidence introduced at trial, including the testimony of the driver of the perpetrators, two participants in the crimes, and one of the victims, Petitioner has not demonstrated a reasonable probability that the outcome of the trial would have been different absent the conflict of interest.  There was testimony by Benton, the woman who drove the four perpetrators to the crime scene, identified Petitioner and Ronnie as two of the perpetrators, watched during the perpetrators' first attempt to gain access to the apartment where Tyler and Jones were shot, and was present when Ronnie stole a van to assist in carrying out the crimes the second time the perpetrators went to the crime scene.  There was testimony of Ronnie and Robertson, both of whom were involved in committing the crimes, and who identified Petitioner as at the scene with two guns and as the shooter of the three individuals who were shot.  There was testimony of Ronnie and Robertson, that Tyler was bound with rope and tape, that Robertson "cut" Tyler, and that Petitioner shot Tyler in the bedroom and shot Jones in the bathroom, which coincided with the location and manner in which those two victims were discovered.  There was testimony by Jones, the female shooting victim, that four men forced their way into the bedroom where she and Tyler were sleeping, and she was shot, resulting in serious physical injuries.  There was testimony of what Petitioner looked like at the time of the offenses, i.e., that he had long hair and no gold teeth in the front of his mouth, and what he looked like shortly after the offenses, i.e., that he had short hair and two gold teeth in the front of his mouth.  There was testimony of the various

places the perpetrators visited before heading to the crime scene; and of the burning of the van after leaving the crime scene. There was evidence that Tyler's clothing and a receipt for dental work were found together in a bag at an address on Minnesota visited by Petitioner to change his clothes before he and the three other men went to the crime scene. There was evidence that the same gun was used to shoot Tyler and Jones inside the apartment, and a different gun was used to shoot Smith, who was shot outside the apartment.

Having failed to establish presumed or actual prejudice, Petitioner's first ground does not support the granting of federal habeas relief.

Petitioner has not shown how the state court findings and conclusions are contrary to or involve an unreasonable application of clearly established federal law regarding the withdrawal of counsel due to a conflict of interest not arising out of the multiple or serial representation of defendants. Nor has Petitioner shown that the state courts unreasonably determined the facts in light of the evidence presented. Point one is denied.

Ground Two - Supervisor was Ineffective for Having Petitioner in Restraints During Trial.[10] The record reflects that, at Supervisor's request, the trial court placed Petitioner in

--------

[10] In this ground for relief, Petitioner also contends his Counsel was ineffective for asking to put Petitioner in shackles during trial. During the course of his argument on his motion to withdraw, Counsel stated "if the Court wants to put restraints on [Petitioner] during his trial to make sure he d[oes]n't do this to another attorney, that is understandable." (Trial Tr. Vol. I, Resp'ts Ex. 1, at 9.) Supervisor also requested that Petitioner be restrained. (Id. at 25; Supervisor's Mot. in Supp. Counsel's Mot. Withdraw, Legal File, Resp'ts Ex. 6, at 44.) In his postconviction appeal argument addressing point one which contended the motion court erred in denying relief because Counsel had a conflict of interest, Petitioner mentioned Counsel joined in Supervisor's request that Petitioner be shackled during trial. (Pet'r. Br., Resp'ts Ex. 16 at 21.) Petitioner did not present this to the state appellate court in any other manner, and did not include it as part of his second point, that contended

shackles, including a belly-chain, during trial to eliminate the possibility that Petitioner would attack Counsel again. Petitioner urges that the request to shackle him constituted the ineffective assistance of counsel. Respondents counter that the state courts' determination to shackle Petitioner during trial due to his physical altercation with Counsel shortly before trial was not contrary to or an unreasonable application of **Strickland**.

The state appellate court found that no error in the motion court's denial of this claim because Supervisor was not Petitioner's counsel and did not have a duty to provide him with the effective representation at trial. (Mem. Supplementing Order Affirming J. Pursuant to Mo. S. Ct. Rule 84.16(b), Resp'ts Ex. 18, at 8.) Petitioner does not specifically challenge that court's findings and conclusion in any respect. Respondents argue the state court's decision should not be disturbed and notes that, when Counsel was not allowed to withdraw, the State had a compelling interest in having the trial proceed safely and without disruptions.

An accused's Sixth Amendment right to the assistance of counsel is a right to the effective assistance of counsel. **Marcrum v. Luebbers**, 509 F.3d 489, 502 (8th Cir. 2007) (citing Kimmelman v. Morrison, 477 U.S. 365, 377 (1986)). "To show a constitutional violation of the right to counsel a [petitioner] must show first, that counsel's performance was deficient, and second, that counsel's errors prejudiced the defense." **Id.** (citations omitted)

_____

Supervisor provided ineffective assistance by requesting that Petitioner be shackled. (Pet'r Br., Resp'ts Ex. 16.) Because it is not clear that Petitioner's contention that Counsel sought shackling of Petitioner during trial was properly presented to the state courts, the Court finds that issue defaulted and, as noted earlier, Petitioner has not established cause and prejudice or that he is actually innocent of the charges. Therefore, the Court finds that part of this ground for relief procedurally barred and will not address the merits of that part of this ground.

(citing Strickland, 466 U.S. at 687); **Kellogg v. Skon**, 176 F.3d 447, 452 (8th Cir. 1999).

To establish that counsel's performance was deficient, a petitioner must show that counsel "'made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" **Greiman v. Thalacker**, 181 F.3d 970, 972 (8th Cir. 1999) (quoting Strickland, 466 U.S. at 687).  More specifically, a petitioner must demonstrate that "counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney." **Armstrong v. Kemna**, 534 F.3d 857, 863 (8th Cir. 2008) (citing Strickland, 466 U.S. at 687-89).  "Only reasonable competence, the sort expected of the 'ordinary fallible lawyer,' is demanded by the Sixth Amendment." **White v. Helling**, 194 F.3d 937, 941 (8th Cir. 1999) (quoting Nolan v. Armontrout, 973 F.2d 615, 618 (8th Cir. 1992)).  The court is highly deferential in analyzing counsel's conduct and "indulg[es] a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment.'" **Armstrong**, 534 F.3d at 863 (quoting Middleton, 455 F.3d at 846).

To establish prejudice, a petitioner must demonstrate "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" **Armstrong**, 590 F.3d at 595-96 (quoting McCauley-Bey v. Delo, 97 F.3d 1104, 1105 (8th Cir. 1996)).  "'A reasonable probability is [a probability] sufficient to undermine confidence in the outcome.'" **Id.** at 596 (quoting McCauley-Bey, 97 F.3d at 1105);  accord **Carroll**, 243 F.3d at 1100 (quoting Strickland, 466 U.S. at 694).  The petitioner bears the

burden of showing such a reasonable probability.  **Lawrence v. Armontrout**, 961 F.2d 113, 115 (8th Cir. 1992).

The question of prejudice from counsel's performance need not be reached if the performance was not deficient.  See **Parkus v. Bowersox**, 157 F.3d 1136, 1140 (8th Cir. 1998).  Conversely, the question of counsel's allegedly deficient performance need not be reached if a petitioner has failed to show prejudice.  See **Strickland**, 466 U.S. at 697; **Williams v. Locke**, 403 F.3d 1022, 1025 (8th Cir. 2005).

Because Petitioner presents no factual or legal basis for overturning the state appellate court's determination that Supervisor was not representing Petitioner, and because an ineffective assistance claim may only be pursued against one's own attorney, this ground does not support the granting of federal habeas relief.

To the extent this Court should consider this as a proper ineffective assistance of counsel claim, Petitioner has not established prejudice, i.e. that but for his shackling during trial the result of the proceeding would have been different.  As noted in the discussion of the first ground for relief, there was more than sufficient evidence introduced at trial, including the testimony of the driver, two participants in the offenses and one victim, to support the jury's verdicts that Petitioner was guilty of all the charged offenses.  Having found no prejudice, the Court need not address the performance prong of the ineffective assistance of counsel claim.

Petitioner has not shown how the state courts' findings and conclusions are contrary to

or involve an unreasonable application of clearly established federal law.  Nor has Petitioner shown that the state courts unreasonably determined the facts in light of the evidence presented on this ground for relief.

Ground two is denied.

Ground Three - Trial Court Erred in Allowing Officer Miller to Provide Hearsay Testimony that One of the Shooting Victims' Names was Smith.  Respondents argue that Officer Miller's testimony identifying one of the shooting victims as Smith is not hearsay, as the Missouri Court of Appeals found, and the testimony was consistent with a reasonable reading of **Crawford v. Washington**, 541 U.S. 36, 68 (2004).[11]  On plain error review, the state appellate court affirmed the admission of the statements upon finding that (1) the admission of hearsay evidence, without objection, cannot constitute plain error and (2) evidence of a person's name is not generally within the rule excluding hearsay evidence and so the officer's testimony regarding Smith's identity was not inadmissible hearsay evidence. (Mem. Supplementing Order Affirming J. pursuant to Mo. S. Ct. R. 30.25(b), Resp'ts Ex. 11 at 11-12.)

While this Court may not review whether the state court's decision that the officer's testimony regarding the identification of Smith was not plain error or was not hearsay evidence under state law, this Court may review a Confrontation Clause challenge to such testimony if that challenge was presented to the state courts.  **Middleton**, 455 F.3d at 855.

---

[11]  The **Crawford** decision was issued on March 8, 2004, before the Missouri Court of Appeals issued its decision in Petitioner's direct appeal on August 17, 2004.

Petitioner presented a Confrontation Clause challenge to admission of Officer Miller's testimony in his post-trial motion and in his brief on direct appeal. (See Post-Conviction Mot., Resp'ts Ex. 6, at 109; Pet'r Br. on Direct Appeal, Resp'ts Ex. 8, at 21-22, 24-25.) Therefore, the Court will consider Petitioner's Confrontation Clause challenge to the admission of Officer Miller's testimony identifying Smith. See **id.** at 855-56.

The Sixth Amendment's Confrontation Clause guarantees an accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. In an effort to safeguard that right, in **Crawford**, the United States Supreme Court overruled **Ohio v. Roberts**, 448 U.S. 56 (1980), and held that out-of-court statements by a witness that are testimonial are inadmissible unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness, even if such statements are deemed reliable by the court. **Crawford**, 541 U.S. at 68-69. While not exhaustively defining "testimonial," the Supreme Court stated, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." **Id.** at 68. The Court then determined the admission of the petitioner's wife's recorded statement to the police about what happened during the alleged offense, which occurred in her presence, was unconstitutional due to the petitioner's lack of opportunity to cross-examine her. **Id.** at 68-69.

In **Middleton**, the Eighth Circuit found a sheriff's testimony regarding a conversation

he had with another state's prosecutor about the petitioner's cases pending in that state was not "testimonial" because it was not "'the kind of memorialized, judicial-process-created evidence of which <u>Crawford</u> speaks.'" **Middleton**, 455 F.3d at 857 (quoting <u>United States v. Manfre</u>, 368 F.3d 832, 838 n. 1 (8th Cir. 2004)).  The Eighth Circuit noted the Supreme Court in **<u>Crawford</u>** left the term "testimonial" ambiguous, and agreed with the district court's determination that the "information related by [the sheriff] 'was not the product of an adversarial or custodial interview or interrogation similar to that described in <u>Crawford</u>,' but instead emerged through circumstances more akin to 'a non-custodial conversation.'" **Middleton**, 455 F.3d at 857.  The court continued its analysis by stating, even if the admission of the prosecutor's statement violated the Confrontation Clause, the error was harmless beyond a reasonable doubt under the harmless error standard set forth in **Chapman v. California**, 386 U.S. 18 (1967).  **Middleton**, 455 F.3d at 857.

Here, as in **Middleton**, the Officer Miller's testimony regarding a bystander's identification of one of the shooting victims "'was not the product of an adversarial or custodial interview or interrogation similar to that described in <u>Crawford</u>,' but instead emerged through circumstances more akin to 'a non-custodial conversation.'" **Middleton**, 455 F.3d at 857 (quoting district court opinion).  Officer Miller's testimony about the conversation between him and the bystander did not result in any identification of the shooter or of Petitioner; and did not occur during an adversarial or custodial interview or interrogation by the officer.  Without further clarification by the Supreme Court, this Court concludes that

Officer Miller's identification of Smith, which resulted from the officer's conversation with a bystander at the crime scene who did not testify at trial, was not a violation of Petitioner's Sixth Amendment right to confrontation as protected by **Crawford**, <u>supra</u>.  Because the Court has concluded there is no constitutional violation in the admission of Officer Miller's testimony identifying Smith, the Court will not consider whether the admission of such testimony constituted harmless error under **Chapman**, <u>supra</u>.

Alternatively, because there is no clear Supreme Court precedent on whether or not another's identification of a shooting victim may be admitted through a police officer's testimony, the Missouri Court of Appeals' determination of the issue through consideration of applicable state law regarding whether or not the testimony was hearsay is not an incorrect or unreasonable application of Supreme Court precedent.  <u>See</u> **Martin v. Fanies**, 365 Fed. Appx. 736, 738-39 (8th Cir.) (unpublished per curiam decision) (due to the lack of clear Supreme Court precedent on whether the admission of a dying declaration violated the petitioner's right to confrontation as set forth in <u>Crawford</u>, the state court's determination that a dying declaration was not testimonial was not objectively unreasonable), <u>cert.denied</u>, 131 S. Ct. 125 (2010).

Petitioner has not shown how the state courts' findings and conclusions are contrary to or involve an unreasonable application of clearly established federal law.  Nor has Petitioner shown that the state courts unreasonably determined the facts in light of the evidence presented on this ground for relief.

Ground three is denied.

Ground seven - Trial Court Abused Its Discretion Admitting Prior Bad Act Evidence - Specifically, Evidence that About One Month Before the Crimes Petitioner Possessed Two Guns Like Those Used in These Crimes. The Missouri Court of Appeals found this testimony was logically and legally relevant and highly probative because it corroborated Ronnie's testimony that Petitioner "possessed and provided the guns that were used in the crimes and that [Petitioner] was one of the participants in the crimes." (Mem. Supplementing Order Affirming J. Pursuant to Mo. S. Ct. Rule 30.25(b), Resp'ts Ex. 11, at 15-16.) The state court found no undue prejudice in its admission because the testimony was elicited to corroborate Ronnie's testimony and the prosecutor "did not elicit testimony suggesting that [Petitioner] had committed a crime or a specific bad act when [the witness] had seen [Petitioner] possess the guns on that prior occasion." (Id. at 15.) Respondents urge that the Missouri Court of Appeals decision is not an incorrect or unreasonable application of Supreme Court precedent and should be left undisturbed, citing **Anderson v. Goeke**, 44 F.3d 675, 678-80 (8th Cir. 1995), as "applying relevant United States Supreme Court precedents to the admission of evidence of prior bad acts which were relevant to proving the crime with which the petitioner was charged."

A federal habeas court may reverse a state court evidentiary ruling as violating the petitioner's right to a fair trial only if the petitioner shows the alleged evidentiary error fatally infected the proceedings and rendered the petitioner's trial fundamentally unfair. **Id.** at 679;

accord **Parker v. Bowersox**, 94 F.3d 458, 460 (8th Cir. 1996) (admission of testimony that the petitioner had blackened the murder victim's eyes on one or two prior occasions did not violate the petitioner's right to due process in that it did not fatally infect the trial because there was "abundant testimony" that the petitioner was threatening and hitting the victim shortly before her death); **Troupe v. Groose**, 72 F.3d 75, 76 (8th Cir. 1995) (admission of earlier deviate sexual intercourse conviction did not violate the petitioner's right to due process in that it did not fatally infect the trial rendering it fundamentally unfair due to the other evidence at trial); see also **Osborne**, 411 F.3d at 916-17 (admission of subsequent uncharged sexual contact between the petitioner and the rape victim was not sufficiently prejudicial to fatally infect the trial and nothing of record indicates that the trial was so fundamentally unfair as to deprive the petitioner of his right to due process). To satisfy his burden, the petitioner must show there is a reasonable probability that the alleged error affected the trial's outcome, i.e., that the verdict would have been different absent the allegedly erroneously admitted evidence. **Anderson**, 44 F.3d at 679; accord **Troupe**, 72 F.3d at 76.

Here, as noted in the discussion of the first ground for relief, there is ample support for the verdict in this case even without the evidence of Petitioner's prior possession of two guns, including the testimony of the driver, two participants, and one victim. Petitioner has not shown there is a reasonable probability that the outcome of the trial would have been different if the jury had not learned of Petitioner's possession of two guns like those used in the crimes about one month before the crimes occurred.

The state appellate court's decision to uphold the admission of the testimony regarding Petitioner's possession of two guns about one month before the crimes was not contrary to or an unreasonable application of clearly established federal law. Additionally, there is no showing that the state courts unreasonably determined the facts in light of the evidence presented on this ground for relief.

Point seven is denied.

<u>Grounds Fourteen and Fifteen - Counsel was Ineffective for Not Objecting to "false evidence of a consent to search form" (ground fourteen) and for Failing to Suppress Evidence Seized at the Minnesota Avenue Address During the Search (ground fifteen).</u> Respondents argue that the state appellate court's consideration of these issues was proper under <u>Strickland</u>, <u>supra</u>, and should not be disturbed.

In the postconviction appeal, the Missouri Court of Appeals reviewed the evidence regarding the obtaining of Terry's consent to search 3548 Minnesota and the seizure, during the ensuing search, of a bag containing Tyler's clothing and a receipt from a dentist's office for placement of two gold crowns on two front teeth. (Mem. Supplementing Order Affirming J. pursuant to Mo. S. Ct. Rule 84.16(b), Resp'ts Ex. 18, at 8-9.) The state appellate court also addressed the record showing that Counsel had discussed with Petitioner whether to file a motion to suppress that seized evidence. (<u>Id.</u> at 9.) In particular, Petitioner had told his Counsel that Petitioner "did not live at a particular address but had stayed with Terry at the house on Minnesota in the days immediately before the night of the crimes with which

[Petitioner] was charged." (Id.) "Counsel believed that Terry lived in the house and, therefore, that Terry's consent to search the house was valid. . . . Based on the information [Petitioner] had relayed to [Counsel] about the address where he had been staying and the lack of any evidence indicating Terry did not have the authority to consent to a police search of . . . at 3548 Minnesota, Counsel concluded that the search was valid and that filing a motion challenging the search would be futile." (Id.) After noting that a warrantless search conducted pursuant to valid, voluntary consent by a person having "common authority" over the premises is constitutionally permitted and such a search is valid when conducted by officers who reasonably believe the person giving the consent has the authority to do so even where that belief is subsequently proven to be erroneous, the Missouri Court of Appeals found Counsel not ineffective for failing to object to the consent to search form or for failing to move to suppress the clothing and receipt found in the bag seized at the Minnesota residence. (Id. at 10, citing State v. Lewis, 17 S.W.3d 168, 170 (Mo. Ct. App. 2000) and Illinois v. Rodriguez, 497 U.S. 177 (1990).) Considering the record objectively, the state appellate court concluded the motion court did not err in denying Petitioner's motion on this ground because Petitioner had failed to show that a motion to suppress would have been successful and Counsel's investigation resulted in Counsel's determination a motion to suppress would have been futile. (Id.)

A cotenant has authority to consent to search of premises and seizure of items within the cotenant's control. **Parton v. Wyrick**, 614 F.2d 154, 158 (8th Cir. 1980); accord

**Rodriquez**, 497 U.S. at 181 ("The Fourth Amendment [does not] prohibit[] the warrantless entry [into premises] to search . . . [when] voluntary consent has been obtained, either from the individual whose property is searched, . . . or from a third party who possesses common authority over the premises" (citations omitted)).  It may be subsequently determined that the officers were not correct in believing the person giving consent had the authority to do so, but that will not invalidate the search if the officers' belief was reasonable based on the facts available to the officer at the time of the search.  **Rodriguez**, 497 U.S. at 188.

Therefore, counsel does not provide ineffective assistance for failing to object to a consent to search, and the seizure of items resulting from that search, when the petitioner and another were living in the searched premises.  **Parton**, 614 F.2d at 158.  This is because, when a motion to suppress would be unavailing, the petitioner is not prejudiced by the petitioner's attorney's failure to file a motion to suppress.  **Id.**; accord **Kellogg v. Scurr**, 741 F.2d 1099, 1104 (8th Cir. 1984) ("The prejudice flowing from an attorney's failure to file a suppression motion is determined by examining the likely success of the motion").  Moreover, a petitioner without standing to file a motion to suppress does not have a claim of ineffective assistance of counsel for failure to file a motion to suppress.  See **Bramlett v. Lockhart**, 876 F.2d 644, 647 (8th Cir. 1989) (where the petitioner's roommate consented to search of the roommate's car that had been used by the petitioner, the petitioner lacked standing to file a motion to suppress a gun found in the car and therefore did not have a claim for ineffective assistance for failure to file a motion to suppress the gun).

Here, the record shows Petitioner reported to Counsel that Petitioner had stayed at the Minnesota address with Terry for several days before the crimes occurred. While the record available now may raise a question about whether Terry lived there or somewhere else, the information given to Counsel by Petitioner indicated Petitioner and Terry stayed at the Minnesota address just prior to the crimes. Under the circumstances, it was reasonable for Counsel to conclude the consent to search was proper and there was no basis to challenge the search or the seizure of the items found during the search.

Even if Counsel was ineffective in failing to object to the consent form or move to suppress the items seized as a result of the search, Petitioner has not established the outcome of the trial would have been different if such an objection or such a suppression motion was successful. Based on the extensive evidence supporting the jury's verdict, including the testimony of the driver, two perpetrators, and one of the victims, as noted in the discussion of ground one, the Court concludes the result of trial would not have been different absent the items seized during the contested search.

Petitioner has not shown how the state courts' findings and conclusions are contrary to or involve an unreasonable application of clearly established federal law. Nor has Petitioner shown that the state courts unreasonably determined the facts in light of the evidence presented on this ground for relief.

Grounds fourteen and fifteen are denied.

## Conclusion

After careful consideration, the Court finds that ten of Petitioner's grounds for relief are procedurally barred, and the remaining six grounds are without merit. Accordingly,

**IT IS HEREBY ORDERED** that Chris Koster is **SUBSTITUTED** for Jeremiah W. "Jay" Nixon as a Respondent in this case.

**IT IS FURTHER ORDERED** that John T. Rathman is **SUBSTITUTED** for Ricardo Martinez as a Respondent in this case.

**IT IS FINALLY ORDERED** that the 28 U.S.C. § 2254 petition of Chavon Adir Wiggins be **DENIED** without further proceedings.

An appropriate Judgment shall accompany this Memorandum and Order.

 /s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of March, 2011.